Sabino PIEMONTE, on behalf of himself and all others similarly situated, Plaintiffs,

v.

CHICAGO BOARD OPTIONS EXCHANGE, INC., et al., Defendants.

No. 75 Civ. 441–CLB.

United States District Court, S. D. New York.

Dec. 18, 1975.

Berman & Zivyak by Jeffrey Zivyak, New York City, for plaintiffs.

Lord, Day & Lord by John J. Loflin, George R. Reid, II, New York City, for defendants Chicago Bd. Options Exchange and Chicago Bd. Options · Exchange Clearing Corp.

Townley, Updike Carter & Rodgers by James K. Leader, New York City, for defendant Chicago Bd. of Trade.

## MEMORANDUM DECISION

BRIEANT, District Judge.

By his second amended complaint, plaintiff sues on behalf of himself and all other individuals who were holders of option contracts issued by the defendant Chicago Board Options Exchange Clearing Corporation[1] ("Clearing Corporation") for the purchase of the underlying stock of International Business Machines Corporation ("IBM") at a price of $180.00 a share which options were exercisable before 10:30 A.M. on January 27, 1975.

Jurisdiction is premised on § 22 of the Securities Act of 1933, 15 U.S.C. § 77v, § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and principles of pendent jurisdiction.

While plaintiff's motion to declare a class action remained undertermined, defendants Chicago Board of Options Exchange, Inc. ("CBOE") and the Clearing Corporation, moved to dismiss the second amended complaint for failure to state a claim under Rule 12(b)(6), F.R.Civ.P., or

1. On January 3, 1975, the Clearing Corporation's Certificate of Incorporation was amended so as to change its corporate name to "The Options Clearing Corporation."

in the alternative for summary judgment pursuant to Rule 56, F.R.Civ.P.

*Undisputed Facts*

CBOE is a non-stock, or membership, corporation organized in Delaware for the purpose of maintaining an auction market for transactions in securities options. It is registered with the Securities and Exchange Commission ("SEC"), pursuant to Section 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f, as a national securities exchange.

The Clearing Corporation is a Delaware corporation organized for the purposes of settling options transactions effected on the floor of the CBOE, as well as on all other national securities exchanges which may be approved by the SEC for options trading, and of assuming the obligations as issuer of all such options.

The CBOE operates as a securities exchange, generally in the same fashion as the New York Stock Exchange and other stock exchanges. It provides an auction market for the purchase and sale of securities by investors—the basic difference being that the only securities traded on the CBOE are call option contracts for certain listed stocks traded publicly and actively on other national securities exchanges.

The call options traded on the CBOE are issued by the Clearing Corporation. These options are securities, each of which gives the holder the right, commencing at the time it is issued and expiring at a fixed expiration date (no longer than nine months after issuance), to purchase 100 shares of a particular underlying stock from the Clearing Corporation at a specified option or exercise price. The expiration date, the exercise price, and the number of shares of the underlying stock for each series of traded options are standardized by CBOE and the Clearing Corporation prior to the issuance of any options of that series. For example, the options involved in this case—IBM Jan 180's—were securities which gave the holder of a single contract the right at any time commencing upon the issuance of the option and expiring at 10:30 A.M., Chicago time, on January 27, 1975, to purchase 100 shares of common stock of IBM from the Clearing Corporation at a purchase price of $180.00 per share.

A CBOE option is issued by the Clearing Corporation only after a buyer and a seller, acting through or for a member firm, have agreed on the floor of the CBOE as to the price (known as the premium) at which the option is to be purchased. The transaction is reported by the parties' brokers to the Clearing Corporation, and the option is issued at 10:00 A.M. on the following business day if the full premium has been paid to the Clearing Corporation by the buyer's broker. The premium is in turn paid by the Clearing Corporation to the seller, who is known as the writer of the option. From the time of issuance until the expiration of the option, the buyer, i. e. the holder of the option, has the right to exercise it in accordance with the Clearing Corporation's rules, and the writer has the obligation, upon the assignment of an exercise notice to him, to perform the Clearing Corporation's obligations with respect to that option. Thus, for every outstanding option issued by the Clearing Corporation, there will be a writer who has agreed (by selling the option through his broker on the floor of the CBOE) to perform the Clearing Corporation's obligation to deliver the underlying stock upon payment of the specified exercise price, in the event that the option is exercised and the exercise notice is assigned to him.

Of course holders of options need not actually exercise them in order to turn a profit. They may instead sell their options in a closing sale transaction. The CBOE maintains an active secondary market in the options issued by the Clearing Corporation up until 2:00 P.M. on the business day preceding the expiration date. Whether a particular option has any value on the secondary market at any time depends upon the then current price of the underlying stock and the perceived likelihood that the stock

will sell above the exercise price on or before the expiration date. Obviously no one would pay a premium for the right to buy a certain stock at a stated price which is higher than the quoted price for the same stock on another exchange, unless one thought that before expiration, the price of the underlying stock would rise above the exercise price. So the quoted price of an option represents the concensus of the market participants as to the future price—value of the underlying stock.

While option holders can either exercise their options or sell them on the CBOE, they must take one of these two courses of action before the expiration date in order to realize a profit on the transaction.

While it might be assumed that all holders whose options have increased in value will either sell or exercise, it is entirely possible that some people may forget that they will lose their entire investment unless they actually do sell before 2:00 P.M. on the business day preceding expiration or exercise in accordance with the Clearing Corporation's rules.

Under the Clearing Corporation's rules, a holder of an option may exercise it only by causing his broker to file a written exercise notice with the Clearing Corporation on the prescribed form on or before the fixed expiration date. When an exercise notice is timely and properly filed, the Clearing Corporation assigns the exercise in accordance with its random selection procedures to any one of the writers of options, having the same standardized terms as the one which was exercised, and that writer is then obligated to perform the Clearing Corporation's obligation to deliver the stock against payment of the exercise price.[2]

*Plaintiff's Claim*

Plaintiff purchased five IBM Jan 180 call options on or about December 24, 1974, through a New York Stock Exchange member firm. These options were issued by the Clearing Corporation and were traded on the CBOE. Each of the five options gave plaintiff the right to purchase, on or before the fixed expiration date, 100 shares of IBM stock at a purchase price of $180.00 per share. The fixed expiration date was January 27, 1975 at 10:30 A.M. Thus to exercise his options plaintiff was required to arrange through his stockbroker for the submission of an exercise notice to the Clearing Corporation prior to that time.[3]

2. Option writers divide themselves into two categories. "Covered option writers" are those writers who have sufficient underlying stock on hand to cover the options which they have sold in the event that exercise notices covering all of these options are assigned to them. Also common in the business is the "uncovered" or "naked" option writer who does not own enough underlying stock to cover all of the options which he has written. As options are exercised and assigned on a random basis through the Clearing Corporation's computer, the uncovered writer must be prepared at any time to go into the market and purchase the underlying stock. Of course the uncovered writer who sees the price of the underlying stock beginning to rise, may decide to cover, by purchasing an option on the CBOE rather than waiting to buy the underlying stock at some unknown future price. He would thus lose only the difference between the cost of this buying-in premium, and the original premium which he received when he wrote the initial option. It should be noted that such a closing purchase transaction has the effect of cancelling the uncovered writer's position as a writer and does not result in the issuance of an option to that investor.

3. Of course, until 2:00 P.M. Central Standard Time on Friday, January 24, 1975, the plaintiff could have sold some or all of his options in the secondary market maintained by the CBOE. Since IBM never sold at or near 180 between December 24, 1974 and January 24, 1975, it is probable that the plaintiff would have had to sell the options at a loss. The point, however, is that in the usual case option buyers are not looking to exercise them, but rather hope to sell them in the secondary market before expiration at a profit. Option buyers are primarily interested in speculating with regard to the price movements of the underlying stock and not in acquiring that stock. If one really wanted to buy IBM stock to hold as a long term investment, rather than purchasing an option and exercising it (thus paying both the premium for the option, and the $180.00 cost per share of the stock), he would ordinarily be better off if he purchased the stock itself directly on an exchange where it is traded.

On January 24, 1975, after the close of trading in the securities markets, the SEC announced a suspension of trading in IBM stock until 10:00 A.M. (Eastern Standard Time), Tuesday, January 28, 1975, or earlier if it appeared in the public interest, because of an impending decision by the United States Court of Appeals for the Tenth Circuit in *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894 (10th Cir. 1975).

Trading in all January IBM options had ceased earlier the same day pursuant to the CBOE rule which stops trading in a series of options at 2:00 P.M. on the business day prior to the expiration date of the series.

The Clearing Corporation announced that IBM January options would be exercisable on January 27, 1975, that is, that the SEC suspension order would affect neither an optionholder's right to exercise his IBM January option, nor the fixed expiration of his option.

On Friday, January 24, 1975, IBM stock closed at 162⅞ on the New York Stock Exchange. On Monday, January 27, 1975 the stock traded in foreign markets at 177 and lower. IBM was not traded on the NYSE on January 27th, but it did open on the Midwest Stock Exchange at 2:31 P.M., after the SEC lifted its suspension of trading. IBM traded on the Midwest Exchange between 181¾ and 186, closing at 182⅞. On Tuesday, January 28th, IBM stock opened on the NYSE at 188, which was the high for the day, and it closed at 179¾.

At the start of business on Monday, January 27, 1975, the expiration date, there were 2,372 IBM Jan 180 option contracts outstanding, each for 100 shares of IBM stock. Eighty-six of these option contracts were exercised that day prior to their expiration. Among those not exercised were the five option contracts owned by plaintiff.

*Counts I and V of the Second Amended Complaint*

In Count I the plaintiff alleges a violation of Rule 10b–5, 17 C.F.R. § 240.10b–5, which was promulgated by the SEC under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). He claims that the Prospectus issued by the Clearing Corporation was "materially misleading and failed to state material facts necessary in order to make the statements therein not false or misleading. . . ." Count V pleads a claim arising under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), in that the defendants ". . . by means of a prospectus and advertisements and oral communications issued false and misleading statements concerning investments in Options in that they falsely informed plaintiff and similarly situated option holders that if the underlying shares went up in price, they would make a profit on their investment in the Option . . . when, in fact, under certain conditions, . . . the plaintiff was not in a position to exercise the option because the underlying stock could not be sold and the plaintiff had no way of knowing how long the suspension in the trading of the underlying stock would continue."

To support these contentions plaintiff relies on four specific sections where the Prospectus is allegedly misleading. The first alleged misrepresentation is on p. 3 of the Prospectus, where the following statement appears: "Stocks approved by the Exchange for Options transactions are registered under the Securities Exchange Act of 1934 for trading on a national securities exchange." Plaintiff contends that this statement carries with it the implied representation that for the duration of the option, the underlying shares will be traded on a national exchange.

The second misrepresentation cited by the plaintiff is more in the nature of an omission. He contends that the Prospectus failed to disclose to investors the risk which they face should the option expire on a day on which the underlying shares were suspended from trading. The plaintiff claims that investors should have been told that in such a case they would have to decide whether to exercise

or not, without any indication of the market value of the underlying stock. Furthermore, plaintiff asserts that the Prospectus made no mention of the fact that if investors did choose to exercise under such circumstances, they would be unable to sell the stock simultaneously with its purchase through the exercise of the option, and would thus face the additional financial burden of having to meet the margin requirements of Regulation T, 12 C.F.R. §§ 220.1, *et seq.*

The third allegedly false and misleading statement is found on p. 11 of the Prospectus, which plaintiff quotes (incorrectly) in its complaint. Correctly quoted this passage reads:

".  .  . trading halts in opening or closing transactions or both, in one or more Options may be imposed by Exchange floor officials for up to two consecutive business days whenever such action is considered advisable in the interest of a fair and orderly market, taking into consideration such factors as trading suspensions or other trading irregularities in an underlying stock, or other unusual circumstances."

Plaintiff maintains that this passage is misleading in that it implies that when trading in the underlying stock is suspended, the Exchange's Board of Directors has the authority to and may impose certain conditions in the interest of a fair and orderly market, including the suspension of the expiration of an option (that is, extending it) during the period when the underlying stock is suspended from trading.

Finally, on page 12 of the Prospectus, the plaintiff points to the following statement as misleading: "The Board of Directors of the Exchange is empowered to restrict, wholly or partially, the exercisability of particular Options if in its judgment such action is necessary for the maintenance of a fair and orderly market in the underlying stock or stocks, or is otherwise deemed advisable in the public interest or for the protection of investors." Plaintiff asserts that this passage would lead a reasonable investor to conclude, unless specifically provided

elsewhere, that if trading in underlying stock is restricted or suspended, then the options will be extended during such period of suspension.

Defendants assert in support of their motion for summary judgment that the Prospectus makes a full and fair disclosure of all the risks of options trading and they have attempted to rebut the plaintiff's contentions as to each of the alleged misrepresentations.

*Discussion*

Pursuant to the last sentence of Rule 12(b), the Court will treat the motion to dismiss for failure to state a claim upon which relief can be granted, as a motion for summary judgment under Rule 56, F.R.Civ.P.

■ It is now well settled that on a motion for summary judgment the Court cannot try issues of fact; it can only determine whether there are issues to be tried. *Heyman v. Commerce and Industry Insurance Company,* 524 F.2d 1317 (2d Cir. 1975); *American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir. 1967). Furthermore, on such a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and the burden is on the moving party to demonstrate the absence of any genuine issue as to any material fact. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

■ Plaintiff's first contention, *i. e.,* that by using the term "Underlying Stocks" on page 3, the defendants impliedly represented that underlying shares which are registered on a national securities exchange would be traded at all times on that exchange during the life of the option, is specifically rebutted by the language on page 6 of the Prospectus which states that "[a]dditional risk may be present in Options transac-

tions by virtue of the fact that Options trading may take place in an underlying stock in which trading has stopped. . . ." Furthermore, the term "Underlying Stock" is defined not on page 3 in the Prospectus Summary, but on page 6 under the Glossary of Terms. There, "Underlying Stock" is defined as "the shares of stock subject to being purchased upon the exercise of an Option." Clearly, there is no implied representation in this definition that the underlying shares will be traded at all times during the life of an option on a national securities exchange. Nor are there any express misrepresentations on page 3.

To state that stocks approved for options trading are registered under the Securities Exchange Act of 1934 is not to represent that they will be traded on a national exchange every business day during the life of the option. To read such a representation into this statement is contrary to common sense and the clear policies of the Securities Exchange Act. Neither CBOE nor the Clearing Corporation has any control over the actions of another national securities exchange, or the SEC, either of whom may suspend trading of any stock registered under Section 12.

Plaintiff's second contention is that the Prospectus fails to disclose risks which investors face if an option should expire on a day when the underlying shares have been suspended from trading. The substance of this claim is that the defendants should have stated that in such a situation the investor would have to make his own estimate or guess as to the relative value of the underlying security, and that if he does exercise, he would have to bear the additional financial burden of meeting the margin requirements of Regulation T, since he would be unable to sell the shares acquired through the exercise of the option on the same day and thus would not be able to qualify under the "Same Day Substitution Rule Exception" to Regulation T. See 12 C.F.R. § 220.3(g).

Citing the warning on page 6 of the Prospectus, quoted *supra*, defendants claim that investors were put on notice of the risk that even though trading in the underlying stock might be suspended, transactions in options might continue. They assert that such disclosure was sufficient and that it was not necessary to detail explicitly all of the obvious consequences of a suspension of trading, in order to make the disclosure which was made not misleading.

Clearly, a reasonable person who reads the entire Prospectus is put on notice of the risks, both general and specific, of options trading. On the front page in bold type there is the following warning:

"Both the purchase and writing of Chicago Board Options involve a high degree of risk and are unsuitable for many investors. Such transactions should be entered into only by investors who have read and understand this prospectus and, in particular, who understand the nature and extent of their rights and obligations and are aware of the risks involved."

This basic theme is reiterated throughout the Prospectus. On page 4 the investor is told that before purchasing or writing an option, ". . . he should inform himself of the risks involved, including the particular risks pertaining to the business and financial condition of the issuer of the underlying stock, and should determine whether such a transaction is appropriate for him in light of his financial situation and investment objectives." Once again on page 16, the warning is clearly stated: "No investor should undertake any transaction in Options unless he thoroughly understands the mechanics and risks involved and is financially able to bear the risks."

The investor is also repeatedly warned that his option becomes worthless if not exercised before its expiration. Furthermore, there is emphasized under the heading *Additional Risks* on page 6, the passage quoted above pertaining to the possibility of a suspension of trading in the underlying stock. The investor is thus put on notice that on certain days there may be no transactions in the underlying stock.

Once warned of this fact, the investor should realize that at certain times there may be no current market price for the underlying stock and that as a result he must guess as to both the value of his option, and whether he should exercise.

Nor is the Prospectus silent on the margin requirements of options trading. First of all it is clearly disclosed that trading may be stopped in the underlying stock on any given day. Thus there is always the possibility that when the holder of an option exercises and purchases the underlying stock, he may be unable to resell this stock on the same day. Second, the Prospectus explicitly calls the reader's attention to the margin requirements in the following passage on page 19:

"Regulation T of the Federal Reserve Board ("the Board") governs the amount of credit (if any) which may be initially extended by a broker or dealer at the time a customer enters into any securities transactions. It should be emphasized that . . . when any transaction occurs in a margin account, the status of the account as a whole must be tested against the requirement of Regulation T . . .

The margin requirements of Regulation T (including the interpretations thereof by the Board) and the margin requirements of the Exchange and of other securities exchanges are very complex, are not uniform, and are subject to change from time to time. . . . Customers should determine the margin obligations that will be imposed upon them by their brokers before engaging in any Options transactions."

The Prospectus does not attempt to advise investors as to the applicability or non-applicability of the Same Day Substitution Rule. It would be impossible to give such particularized advice because, as the general notice quoted above points out, the application of Regulation T depends upon a thorough analysis of all the specific transactions in a customer's account, including his equity position, other factual data pertaining to that customer, and any special requirements which might be imposed on him by his broker. In light of these facts, it is clear that the Prospectus was not misleading by failing to advise concerning the Same Day Substitution Rule. Instead of attempting to lay out all the surrounding complexities (which would, of course, have raised an even greater risk of a 10b–5 violation), the Prospectus prudently advised investors that they should consult their own brokers on the complex problem of meeting the margin requirements of Regulation T.

Plaintiff's third allegation, that the passage on page 11 referring to trading halts in the options market which may be imposed by the CBOE, implies that the expiration of options will be suspended during the period that trading in the underlying stock is suspended, is based on an incomplete and inaccurate quotation. That passage which is correctly quoted in Part III, refers to the possibility of restrictions, suspensions, or halts in specified types of options trading transactions, but it does not refer to or suggest any possibility of extending the fixed expiration date for exercise of an option. If anything, the listing of permissible actions negates any implication with respect to other unspecified actions. Plaintiff's third contention like his first and second thus does not raise a genuine issue of fact.

Plaintiff's fourth and final contention is also based on an incomplete quotation. On page 12 of the Prospectus, the Board of Directors is given the power to restrict the exercisability of particular options if such restrictions are necessary for the maintenance of a fair and orderly market in the underlying stocks. But the Prospectus goes on to state (and the plaintiff fails to include this passage in his brief):

"However, commencing ten business days prior to an option's expiration date, no such restriction will remain in effect; instead the Board of Directors may impose a restriction on delivery of underlying stock not already owned by

a writer to whom an exercise notice is assigned and may fix a daily settlement value for such Option."

The Board is thus powerless to restrict exercise during the ten day period prior to expiration, but instead it may direct the payment of the cash value of the stock in place of actual delivery. The whole thrust of this section runs against any implication of a power in the Board to extend the expiration date. The terms of the option are agreed upon by the purchaser and the writer at the time the option is issued, and while the Board has the limited power to restrict exercise up to ten days before expiration, once this ten day period begins to run, the Board is powerless to interfere with any of the terms of the option. Plaintiff claims that he would assume from the Prospectus that such a power to extend the expiration date did exist. However, his assumption is contrary to the clear language of the Prospectus and the whole tenor of the section which he quotes incompletely.

Since there are no false statements, and no misleading omissions, there are no genuine issues of fact to be tried with respect to the plaintiff's 10b–5 claim. Accordingly, the defendant is entitled to summary judgment as to Count I of the plaintiff's second amended complaint.

As for Count V, the claim arising under Section 12(2) of the 1933 Act, the plaintiff may only recover thereunder if he can show that the defendants offered or sold him a security through the use of the mails, or an instrument of, or a communication in, interstate commerce by means of a Prospectus or oral communication containing an untrue statement of material fact or an omission to state a material fact necessary to make the statements which were made not misleading in light of the circumstances under which they were made. It is clear from the discussion of the Rule 10b–5 claim that the plaintiff has failed to substantiate his contention that the Prospectus contains any misrepresentations or half-truths. Nor has he alleged that any oral statements made to him by the defendants were untrue or misleading. Movants are also entitled to summary judgment as to Count V of the second amended complaint.

Plaintiff has not opposed defendants' Rule 12(b)(6) motion insofar as it seeks dismissal of Counts II and III. Accordingly, Counts II and III will be dismissed with prejudice.

In addition, Counts IV and VI will be dismissed with prejudice for failure to state a claim.[4]

Defendant Chicago Board of Trade has not joined in this motion. It was sued only because it is alleged to be a person who controls CBOE. In view of the determination which has been reached here, the Court upon its own motion will grant the same relief to the Chicago Board of Trade as it has directed with respect to the other defendants. As plaintiff has amended his pleading twice, no purpose will be served in granting further leave to amend.

Settle a final Judgment on five (5) days notice.

---

4. Count IV asserts that the CBOE and the Clearing Corporation owed the plaintiff a fiduciary duty to treat him fairly and protect his interests. In the papers filed in opposition to this motion, plaintiff cites no authority to support this concept of fiduciary duty. Securities exchanges are not in a fiduciary relationship with individuals who buy and sell shares through their facilities. See *Baird v. Franklin*, 141 F.2d 238, 239 (2d Cir. 1944). Count VI is merely a conclusory assertion that each of the defendants are liable for the misstatements and omissions. It does not set forth any other or further theory or basis for finding liability, and adds nothing substantive to Counts I and V.