810 F.2d 336
 Fed. Sec. L. Rep. P 93,101, 6 Fed.R.Serv.3d 1136
 Morris AKERMAN and Susan Akerman, Plaintiffs-Appellants,
Cross-Appellees,
Dr. Lawrence Kuhn, Intervenor-Plaintiff,
v.
ORYX COMMUNICATIONS, INC., Moore & Schley, Cameron & Co.,
Robertson Securities Corporation and Laidlaw Adams
& Peck, Inc., Defendants- Appellees,
Appeal of MOORE & SCHLEY, CAMERON & CO., Robertson
Securities Corporation and Laidlaw Adams & Peck,
Inc., Defendants-Appellees, Cross-Appellants.
 Nos. 106, 230, Dockets 86-7398, 86-7436.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 23, 1986.
Decided Jan. 26, 1987.
 
 Jules Brody, New York City (Edwin J. Mills, Stull, Stull & Brody, New York City, of counsel), for plaintiffs-appellants, cross-appellees.
 Jeffrey A. Fillman, New York City (Finley, Kumble, Wagner, Heine, Underberg, Manley, Meyerson & Casey, New York City, of counsel), for defendant-appellee Oryx Communications, Inc.
 William F. Koegel, New York City (Peter Kimm, Jr., Rogers & Wells, New York City, of counsel), for defendants-appellees-cross-appellants Moore & Schley, Cameron & Co., Robertson Securities Corp. and Laidlaw, Adams & Peck, Inc.
 Before VAN GRAAFEILAND, MESKILL and NEWMAN, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Plaintiffs Morris and Susan Akerman and Dr. Lawrence Kuhn appeal from an order of the United States District Court for the Southern District of New York, Sofaer, J., granting summary judgment disposing of their claims under section 11 of the Securities Act of 1933 (Act) against defendants Oryx Communications, Inc. ("Oryx" or "issuer"), Moore & Schley, Cameron & Co., Robertson Securities Corp. and Laidlaw, Adams & Peck (underwriters), and disposing of their claims under section 12(2) of the Act as against the issuer. The Akermans also appeal from the district court's refusal to certify a defendant class of underwriters with respect to the remaining section 12(2) claims. The underwriters cross-appeal from the district court's denial of their motion for summary judgment against the Akermans' section 12(2) claims. The district court directed the entry of a final judgment and issued a Fed.R.Civ.P. 54(b) certificate as to the claims determined on defendants' motions for summary judgment.
 
 
 2
 We affirm the judgment on the plaintiffs' section 11 and section 12(2) claims and dismiss the plaintiffs' class certification and the underwriters' section 12(2) appeals for lack of appellate jurisdiction and remand to the district court for further proceedings.
 
 BACKGROUND
 
 3
 This case arises out of a June 30, 1981, initial public offering of securities by Oryx, a company planning to enter the business of manufacturing and marketing abroad video cassettes and video discs of feature films for home entertainment. Oryx filed a registration statement and an accompanying prospectus dated June 30, 1981, with the Securities and Exchange Commission (SEC) for a firm commitment offering of 700,000 units. Each unit sold for $4.75 and consisted of one share of common stock and one warrant to purchase an additional share of stock for $5.75 at a later date.
 
 
 4
 The prospectus contained an erroneous pro forma unaudited financial statement relating to the eight month period ending March 31, 1981. It reported net sales of $931,301, net income of $211,815, and earnings of seven cents per share. Oryx, however, had incorrectly posted a substantial transaction by its subsidiary to March instead of April when Oryx actually received the subject sale's revenues. The prospectus, therefore, overstated earnings for the eight month period. Net sales in that period actually totaled $766,301, net income $94,529, and earnings per share three cents.
 
 
 5
 Oryx's price had declined to four dollars per unit by October 12, 1981, the day before Oryx revealed the prospectus misstatement to the SEC. J. App. at 154. The unit price had further declined to $3.25 by November 9, 1981, the day before Oryx disclosed the misstatement to the public. J.App. at 140. After public disclosure, the price of Oryx rose and reached $3.50 by November 25, 1981, the day this suit commenced. J.App. at 140.
 
 
 6
 Plaintiffs allege that the prospectus error rendered Oryx liable for the stock price decline pursuant to sections 11 and 12(2) of the Securities Act of 1933. In July 1982, Oryx moved for summary judgment on the grounds, inter alia, that the misstatement was not material for purposes of establishing liability under section 11 and that the misstatement had not actually caused the price decline for purposes of damages under section 11. Oryx also moved for summary judgment on the section 12(2) claims, again arguing that the error was immaterial and also that plaintiffs lacked "privity," as required under section 12(2), to maintain a suit against Oryx as an issuer because the offering was made pursuant to a "firm commitment underwriting." In December 1982, plaintiffs brought the underwriters into the suit. The underwriters subsequently moved for summary judgment, making substantially the same arguments as had Oryx.
 
 
 7
 The district court held that the plaintiffs had established materiality "as a theoretical matter" for purposes of establishing liability under sections 11(a) and 12(2). Akerman v. Oryx Communications, Inc., 609 F.Supp. 363, 366-68 (S.D.N.Y. 1984). The court, however, granted summary judgment to all of the defendants with respect to section 11 because defendants had established that the prospectus error did not actually result in any part of the stock price decline and they thereby prevailed pursuant to the affirmative defense set out in that section. Id. at 372.
 
 
 8
 The district court also granted summary judgment to Oryx with respect to section 12(2), holding that plaintiffs lacked the privity required to maintain an action against Oryx as the issuer, not the immediate seller of the securities in question. Having ruled that the prospectus error was material, however, the court permitted the Akermans to proceed against their immediate sellers (the underwriters) under section 12(2). Id. at 374. Finally, the district court denied the Akermans' request to certify a defendant class of underwriters under this section because the Akermans had failed to demonstrate the requisite privity with respect to each defendant. Id. at 376.
 
 DISCUSSION
 A. Jurisdiction
 
 9
 Denial of summary judgment does not constitute a disposition on the merits; the dispute remains to be resolved at trial. See Pacific Union Conference of Seventh-Day Adventists v. Marshall, 434 U.S. 1305, 1306, 98 S.Ct. 2, 3, 54 L.Ed.2d 17 (1977) (denial of summary judgment not final judgment); Meyer v. Stern, 599 F.Supp. 295, 296-97 (D.Colo.1984) (same). Rule 54(b) "does not relax the finality required of each decision ... to render it appealable." Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 435, 76 S.Ct. 895, 899, 100 L.Ed. 1297 (1956). See 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d Sec. 2656, at 50 (1983) (certification under Rule 54(b) requires finality). Therefore, even though the district court certified for immediate appeal, pursuant to Fed.R.Civ.P. 54(b), "the issues determined on defendants' motions for summary judgment," J.App. at 1244, the issues raised by the underwriters' section 12(2) appeal and by the plaintiffs' class certification appeal are not properly before us.
 
 
 10
 The Akermans' appeal from the district court's refusal to certify a defendant class of underwriters falls to the same fate. The order does not of its own force terminate the litigation because the Akermans may proceed against each defendant individually. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (denial of certification of plaintiff class not final judgment). Such an order may be appealed only if it falls "within an appropriate exception to the final-judgment rule." Id.
 
 
 11
 Plaintiffs contend that such an exception exists. They argue that we may hear the class certification appeal as "pendent" to the claims properly before us. See Marcera v. Chinlund, 595 F.2d 1231, 1236 n. 8 (2d Cir.) (denial of class certification may be heard, in appellate court's discretion, as "pendent" to independently appealable issues), vacated on other grounds sub nom. Lombard v. Marcera, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979). We disagree. This exception exists only "where the order disposing of the class action motion contains an appealable ruling and that ruling and the class certification are substantially interdependent." Port Authority Police Benevolent Ass'n v. Port Authority of New York & New Jersey, 698 F.2d 150, 152 (2d Cir.1983). Pendent appellate jurisdiction is a procedural device that rarely should be used because of the danger of abuse. Marcera, 595 F.2d at 1245 (Van Graafeiland, J., dissenting) (citing 16 Wright & Miller, Federal Practice and Procedure Sec. 3937, at 270-71 (1977)); see Sanders v. Levy, 558 F.2d 636, 643 (2d Cir.1976) (exceptions to finality requirement permitted only in "extraordinary circumstances"), adhered to on this point in banc, 558 F.2d 646 (1977), rev'd on other grounds sub nom. Oppenheimer Fund v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).
 
 
 12
 The district court denied the Akermans' request to certify a defendant class because they lacked privity as required under section 12(2), see section B.2, infra, with each member of the proposed defendant class. Akerman, 609 F.Supp. at 374-76. The Akermans were permitted to proceed under section 12(2), however, against those underwriters from whom they directly purchased shares of Oryx. Id.
 
 
 13
 The final judgments properly before us, the section 11 appeal and section 12(2) appeal with respect to the issuer, do not sufficiently overlap with the certification issue to warrant exercise of pendent jurisdiction. The final judgments speak only to causation of damages regarding section 11 and the existence of privity between the Akermans and Oryx regarding section 12(2). The certification issue, however, requires evaluation of the very requirement that each named plaintiff possess standing to sue each member of the proposed class under section 12(2), as well as the fact-specific determination of whether each named plaintiff actually enjoys the requisite privity. These issues are not "substantially interdependent" with the final judgments properly appealed to us. This deficiency distinguishes the instant case from Marcera, 595 F.2d at 1236 n. 8, where we exercised pendent jurisdiction because the "fundamental error" involved in the properly appealed district court judgment flawed the district court's interlocutory ruling as well. Id. See General Motors v. City of New York, 501 F.2d 639, 648 (2d Cir.1974) (pendent jurisdiction denied where "no such overlap exists between the [class action certification order] and the [independently appealable] order"). Finally, our refusal to accept jurisdiction does not risk waste of judicial resources because this case would proceed irrespective of how we might dispose of the class certification issue. See, e.g., San Filippo v. U.S. Trust Co. of New York, 737 F.2d 246, 255 (2d Cir.1984) (risk of wasting judicial resources by denying jurisdiction militates in favor of exercising pendent jurisdiction), cert. denied, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985).
 
 B. The Merits
 1. Section 11 Claims
 
 14
 Section 11(a) of the 1933 Act imposes civil liability on the signatories of a registration statement if the registration statement contains a material untruth or omission of which a "person acquiring [the registered] security" had no knowledge at the time of the purchase. 15 U.S.C. Sec. 77k(a) (1982); Ross v. Warner, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 97,735 at 98,860 (S.D.N.Y.1980).[1] Plaintiffs in the Akermans' situation, if successful, would be entitled to recover the difference between the original purchase price and the value of the stock at the time of suit. 15 U.S.C. Sec. 77k(e). A defendant may, under section 11(e), reduce his liability by proving that the depreciation in value resulted from factors other than the material misstatement in the registration statement. 15 U.S.C. Sec. 77k(e); Greenapple v. Detroit Edison Co., 618 F.2d 198, 203 n. 9 (2d Cir.1980). A defendant's burden in attempting to reduce his liability has been characterized as the burden of "negative causation." Beecher v. Able, 435 F.Supp. 397, 409 (S.D.N.Y. 1975).
 
 
 15
 The district court determined that plaintiffs established a prima facie case under section 11(a) by demonstrating that the prospectus error was material "as a theoretical matter." Akerman, 609 F.Supp. at 366-68. The court, however, granted defendants' motion for summary judgment on damages under section 11(e), stating: "[Defendants] have carried their heavy burden of proving that the [Oryx stock price] decline was caused by factors other than the matters misstated in the registration statement." Id. at 372. The precise issue on appeal, therefore, is whether defendants carried their burden of negative causation under section 11(e).
 
 
 16
 Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases. See Globus v. Law Research Service, 418 F.2d 1276, 1288 (2d Cir.1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Defendants' burden, however, is not insurmountable; section 11(e) expressly creates an affirmative defense of disproving causation. See, e.g., Ross, Fed.Sec.L.Rep. (CCH) p 97,735 at 98,862 (summary judgment on section 11 claims appropriate in "light of the minimal materiality of [defendant's] nondisclosure and the market's failure to react in any discernible way to the revelations").
 
 
 17
 The Akermans' section 11(a) claim survived an initial summary judgment attack when the court concluded that the prospectus misstatement was material. Akerman, 609 F.Supp. at 366-68. We note, however, that the district court held that the misstatement was material only "as a theoretical matter." Id. at 368. As described below, this conclusion weighs heavily in our judgment that the district court correctly decided that the defendants had carried their burden of showing that the misstatement did not cause the stock price to decline.
 
 
 18
 The misstatement resulted from an innocent bookkeeping error whereby Oryx misposted a sale by its subsidiary to March instead of April. Oryx received the sale's proceeds less than one month after the reported date. The prospectus, moreover, expressly stated that Oryx "expect[ed] that [the subsidiary's] sales will decline." J. App. at 102. Indeed, Morris Akerman conceded that he understood this disclaimer to warn that Oryx expected the subsidiary's business to decline. J.App. at 33-34. See Piemonte v. Chicago Board Options Exchange, 405 F.Supp. 711, 716-17 (S.D.N.Y. 1975) (prospectus disclaimer explicitly describing risks of investment undercuts plaintiff's contention that investment's risks undisclosed).
 
 
 19
 Thus, although the misstatement may have been "theoretically material," Akerman, 609 F.Supp. at 366, when it is considered in the context of the prospectus' pessimistic forecast of the performance of Oryx's subsidiary, the misstatement was not likely to cause a stock price decline. Compare SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 839-41, 849 (2d Cir.1968) (in banc) (failure to disclose discoveries of minerals on reporting company's property must be evaluated "in light of the totality of the company activity"), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Beecher v. Able, 374 F.Supp. 341, 344-46 (S.D.N.Y.1974) (failure to disclose impending losses was material in view of "omnipresent adversity"); Feit v. Leasco Data Processing Equipment Corp., 332 F.Supp. 544, 572 (E.D.N.Y.1971) (failure to report tens of millions of dollars in assets is significant under any materiality test); Escott v. BarChris Construction Corp., 283 F.Supp. 643 (S.D.N.Y. 1968) (failure to disclose facts clearly indicating impending financial demise). Indeed, the public not only did not react adversely to disclosure of the misstatement, Oryx's price actually rose somewhat after public disclosure of the error.
 
 
 20
 The applicable section 11(e) formula for calculating damages is "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and ... the value thereof as of the time such suit was brought." 15 U.S.C. Sec. 77k(e). The relevant events and stock prices are:
 
 
 21
 Oryx Stock
 Date Event Price
June 30, 1981 Initial public offering $4.75
October 15, 1981 Disclosure of error to SEC $4.00
November 10, 1981 Disclosure of error to public $3.25
November 25, 1981 Date of suit $3.50
 
 
 22
 The price decline before disclosure may not be charged to defendants. See Beecher v. Able, 435 F.Supp. 397, 407 (S.D.N.Y.1975) (price decline before misstatement revealed not attributable to defendants under section 11(e)); Fox v. Glickman Corp., 253 F.Supp. 1005, 1010 (S.D.N.Y.1966) (same). At first blush, damages would appear to be zero because there was no depreciation in Oryx's value between the time of public disclosure and the time of suit.
 
 
 23
 The Akermans contended at trial, however, that the relevant disclosure date was the date of disclosure to the SEC and not to the public. Under plaintiffs' theory, damages would equal the price decline subsequent to October 15, 1981, which amounted to fifty cents per share. Plaintiffs attempted to support this theory by alleging that insiders privy to the SEC disclosure--Oryx's officers, attorneys and accountants, and underwriters and SEC officials--sold Oryx shares and thereby deflated its price before public disclosure. Akerman, 609 F.Supp. at 370-71. The district court attributed "at least possible theoretical validity" to this argument. Id. at 370. After extensive discovery, however, plaintiffs produced absolutely no evidence of insider trading. Id. at 371. Plaintiffs' submissions and oral argument before us do not press this theory.
 
 
 24
 The Akermans first attempted to explain the public's failure to react adversely to disclosure by opining that defendant-underwriter Moore & Schley used its position as market maker to prop up the market price. This theory apparently complemented the Akermans' other theory that insiders acted on knowledge of the disclosure to the SEC to deflate the price before public disclosure. The Akermans failed after extensive discovery to produce any evidence of insider trading and have not pressed the theory on appeal.
 
 
 25
 The district court invited statistical studies from both sides to clarify the causation issue. Defendants produced a statistical analysis of the stocks of the one hundred companies that went public contemporaneously with Oryx. The study tracked the stocks' performances for the period between June 30, 1981 (initial public offering date) and November 25, 1981 (date of suit). The study indicated that Oryx performed at the exact statistical median of these stocks and that several issues suffered equal or greater losses than did Oryx during this period. Akerman, 609 F.Supp. at 372. Defendants produced an additional study which indicated that Oryx stock "behaved over the entire period ... consistent[ly] with its own inherent variation." Id.[2]
 
 
 26
 Plaintiffs offered the following rebuttal evidence. During the period between SEC disclosure and public disclosure, Oryx stock decreased nineteen percent while the over-the-counter (OTC) composite index rose five percent (the first study). During this period, therefore, the OTC composite index outperformed Oryx by twenty-four percentage points. Plaintiffs also produced a study indicating that for the time period between SEC disclosure and one week after public disclosure, eighty-two of the one hundred new issues analyzed in the defendants' study outperformed Oryx's stock. J. App. at 1120-22.
 
 
 27
 Plaintiffs' first study compared Oryx's performance to the performance of the OTC index in order to rebut a comparison offered by defendants to prove that Oryx's price decline resulted not from the misstatement but rather from an overall market decline. As previously stated, defendants' comparison indicated that the OTC index generally declined for the period between Oryx's offering date and the date of suit. Akerman, 609 F.Supp. at 371. The parties' conflicting comparisons, however, lack credibility because they fail to reflect any of the countless variables that might affect the stock price performance of a single company. See United States v. Ironworkers Local 86, 443 F.2d 544, 551 (9th Cir.) ("use [of statistical comparisons] is conditioned by the existence of proper supportive facts and the absence of variables which undermine the reasonableness of the inference[s] ... drawn"), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). Statistical analyses must control for relevant variables to permit reliable inferences. Id.; A. Koutsoyiannis, Theory of Econometrics, chs. 2, 12 (2d ed. 1977).
 
 
 28
 The studies comparing Oryx's performance to the other one hundred companies that went public in May and June of 1981 are similarly flawed. The studies do not evaluate the performance of Oryx stock in relation to the stock of companies possessing any characteristic in common with Oryx, e.g., product, technology, profitability, assets or countless other variables which influence stock prices, except the contemporaneous initial offering dates.
 
 
 29
 Perhaps more important, the Akermans' study of the one hundred new issues focuses on a time frame which controverts one of their own theories explaining the public's failure to react adversely to disclosure. The Akermans argue that the thin market in Oryx stock prevented immediate public reaction to disclosure of the prospectus error. J.App. at 599-600. Their study, however, measures Oryx's performance from SEC disclosure to one week after public disclosure. A thin market, according to the Akermans' own explanation, would not reflect the impact of bad news in such a short time period (one week). This internal inconsistency seriously undercuts the probative value of the Akermans' study.
 
 
 30
 Finally, we note that this time period drew its relevance from the Akermans' theory that insider trading deflated Oryx's price during this period. As previously stated, this theory has no support even after extensive discovery and is not pressed on appeal.
 
 
 31
 Granting the Akermans every reasonable, favorable inference, the battle of the studies is at best equivocal; the studies do not meaningfully point in one direction or the other.
 
 
 32
 The Supreme Court recently articulated the summary judgment standard as follows: "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., --- U.S. ----, ----, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id.
 
 
 33
 Defendants met their burden, as set forth in section 11(e), by establishing that the misstatement was barely material and that the public failed to react adversely to its disclosure. With the case in this posture, the plaintiffs had to come forward with "specific facts showing that there is a genuine issue for trial." Anderson, --- U.S. at ----, ----, 106 S.Ct. at 2511. Despite extensive discovery, plaintiffs completely failed to produce any evidence, other than unreliable and sometimes inconsistent statistical studies and theories, suggesting that Oryx's price decline actually resulted from the misstatement. See Celotex Corp. v. Catrett, --- U.S. ----, ----, 106 S.Ct. 2548, 2554-55, 91 L.Ed.2d 265 (1986) (plaintiff's ample discovery opportunities negate any "claim ... that [plaintiff] was in any sense 'railroaded' by a premature motion for summary judgment"). Summary judgment was properly granted.
 
 2. Section 12(2) Claims Against Oryx
 
 34
 The Akermans also appeal the district court's holding that they lack privity to maintain a suit against Oryx under section 12(2) of the Securities Act of 1933. Section 12(2) imposes liability on persons who offer or sell securities and only grants standing to "the person purchasing such security" from them. 15 U.S.C. Sec. 77l (2) (1982). This provision is a broad anti-fraud measure and imposes liability whether or not the purchaser actually relied on the misstatement. Sanders v. John Nuveen & Co., 619 F.2d 1222, 1225-27 (7th Cir.1980), cert. denied, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981).
 
 
 35
 The offering here was made pursuant to a "firm commitment underwriting," as the prospectus indicated. Title to the securities passed from Oryx to the underwriters and then from the underwriters to the purchaser-plaintiffs. Oryx, therefore, was not in privity with the Akermans for section 12(2) purposes. See Unicorn Field, Inc. v. Cannon Group, Inc., 60 F.R.D. 217, 221-23 (S.D.N.Y.1973).
 
 
 36
 The Akermans nonetheless contend that Oryx may be held liable under section 12(2) as a participant in the offering. It is true that a person who makes a misrepresentation may be held liable as a "participant" even though he is not the immediate and direct seller of the securities. This is true, however, only if there is proof of scienter. See Lanza v. Drexel & Co., 479 F.2d 1277, 1298-99 (2d Cir.1973) (in banc) (section 12(2) "requires privity, or, in the absence of privity, scienter" (footnote omitted)); Hitchcock v. deBruyne, 377 F.Supp. 1403, 1405-06 (D.Conn.1974) (same). The Akermans completely failed to make a showing that Oryx possessed scienter. Therefore, summary judgment was proper.
 
 
 37
 We affirm the judgment on the plaintiffs' section 11 and section 12(2) claims and dismiss the plaintiffs' class certification and the underwriters' section 12(2) appeals for lack of appellate jurisdiction and remand to the district court for further proceedings.
 
 
 
 [1]
 Section 11(a) provides in pertinent part:
 In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--
 (1) every person who signed the registration statement;
 ....
 (5) every underwriter with respect to such security.
 15 U.S.C. Sec. 77k(a).
 
 
 [2]
 This study "focused strictly on Oryx's price behavior and assumed stable market conditions." J.App. at 674. The study appears to be the most germane statistical evidence offered at trial because it purports to evaluate Oryx stock's performance in relation to the performance it would have experienced if the defendants had not committed and publicly disclosed the error. The test's results "support[ ] the hypothesis that Oryx's price change over the period" from its initial offering date to the time of suit "was consistent with reasonably assumed chance laws operative under normal circumstances." Id
 The study, however, concedes: "It should be kept in mind ... that a statistical test of hypothesis cannot prove a hypothesis to be true; it can only assert with a certain measure of confidence that statistical evidence either rejects or does not reject the hypothesis." J.App. at 678. The study thus demonstrates the danger of relying on bare statistical analysis. See Spaulding v. University of Washington, 740 F.2d 686, 703 (9th Cir.) ("statistical evidence has an inherently slippery nature and can be exaggerated, over-simplified, or distorted to create support for a position that is not otherwise supported by the evidence") (citations omitted), cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984); Note, Judicial Refinement of Statistical Evidence in Title VII Cases, 13 Conn.L.Rev. 515, 525 (1981).