## In re WORLDS OF WONDER SECURITIES LITIGATION.

Rosetta MILLER; Walter Untermeyer; Alan Nisselson; Trudy Whitman Nisselson; Paul Greenstein; Howard H. Weston, as Trustee for the Florida Municipal, Inc., Restated Defined Benefit Trust and Plan; Sylvia Wind, on behalf of themselves and the certified class of purchasers of securities of Worlds of Wonder, Inc., Plaintiffs–Appellants,

v.

Angelo M. PEZZANI; Donald D. Kingsborough; Richard B. Stein; John B. Howenstine; Barry H. Margolis; Deloitte & Touche; Smith Barney, Harris, Upham & Co.; Dean Witter Reynolds, Inc.; Josephine E. Abercrombie; Worlds of Wonder Shares Partnership; Robinson Interests, Inc., Defendants–Appellees.

Nos. 93–15321, 93–15535.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 10, 1994.

Decided Sept. 15, 1994.

Alan R. Plutzik, Gold & Bennett, San Francisco, CA, for plaintiffs-appellants.

Jared L. Kopel and James A. DiBoise, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Daniel J. Bergeson and Mark E. Waite of Bergeson, Eliopoulos, Grady & Gray, San Jose, CA, for defendants-appellees Pezzani, Kingsborough and Stein.

J. Clifford Gunter, III, and Gayle A. Boone, Bracewell & Patterson, Houston, TX, for defendant-appellee Howenstine.

Stephen D. Susman, Susman Godfrey, Karen A. Oshman, Houston, TX, for defendants-appellees Margolis and Worlds of Wonder Shares Partnership.

Leslie G. Landau and Philip R. Rotner, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for defendant-appellee Deloitte & Touche.

William F. Alderman, Orrick, Herrington & Sutcliffe, San Francisco, CA, for defendants-appellees Smith Barney and Dean Witter Reynolds.

David T. Hedges, Jr., Vinson & Elkins, Houston, TX, and Joel Zeldin and Lin M. Trucksess, Shartsis, Friese & Ginsburg, San Francisco, CA, for defendant-appellee Abercrombie.

Layne E. Kruse, Fulbright & Jaworski, Houston, TX, and Marvin D. Morgenstein, Morgenstein & Jubelirer, San Francisco, CA, for defendant-appellee Robinson Interests, Inc.

Before: FLETCHER, HALL, and WIGGINS, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

In this appeal, we consider the saga of Worlds of Wonder, Inc. ("WOW"), a toy company that sold $80 million of "junk bonds" to the investing public in June 1987. When WOW defaulted on its very first interest payment and filed for bankruptcy just six months later, rendering the securities worthless, a class of disappointed investors filed this securities-fraud action, naming as defendants WOW's officers, directors, auditors, underwriters, and major shareholders. The district court granted summary judgment in favor of all defendants and the investors appealed. After considering a myriad of issues, we affirm in part and reverse in part.

## I.

In 1985, Donald Kingsborough formed WOW to manufacture and distribute "The World of Teddy Ruxpin," a product line featuring animated toy bears and accessories. Teddy Ruxpin was an immediate success, becoming a top seller for the 1985 Christmas season and generating net sales of $93 million in WOW's first fiscal year, which ended March 31, 1986. Shortly thereafter, WOW launched "Lazer Tag," a product line featuring infrared toy weapons. Lazer Tag became another instantaneous hit and, as Teddy Ruxpin continued to move briskly off the shelves, WOW posted two of the ten best-selling toys of the 1986 Christmas season. Ultimately, WOW recorded net sales of $327 million for fiscal 1987, which ended March 31, 1987.

Hoping to fund further expansion, WOW conducted a public offering of unsecured 9% convertible subordinated debentures on June 4, 1987 ("the Debenture Offering"), raising $80 million. (In common parlance, the debentures were "junk bonds" because they bore an above-market interest rate to compensate for the risk associated with their "below investment grade" rating). This additional infusion of capital, however, proved inadequate to sustain the corporation's uncontrolled growth and, almost immediately, WOW commenced a series of public disclosures that led to sharp declines in the market price of the debentures and, eventually, to a total financial collapse.

On July 27, 1987, the corporation reported losses of $10 million for the first quarter of fiscal 1988, ending June 30, 1987. Shortly thereafter, on August 7, 1987, WOW terminated fifteen percent of its domestic workforce (fifty-five employees) and announced reductions in capital expenditures. Two months later, the corporation disclosed that it had laid off another seventeen percent of

its workforce (sixty employees) and engaged in further cost-cutting measures. On November 9, 1987, WOW reported net losses of $43 million for the second quarter of fiscal 1988, ending September 30, 1987, and announced price reductions on Teddy Ruxpin and Lazer Tag. Finally, after 1987 Christmas sales fell far below projections, WOW defaulted on the first interest payment of the debentures and, shortly thereafter, filed for bankruptcy on December 21, 1987, rendering the securities worthless.

Several purchasers of WOW debentures ("the plaintiffs") subsequently filed this class action, alleging securities fraud in connection with the Debenture Offering, against (1) WOW officers Kingsborough, Angelo Pezzani, and Richard Stein ("the Officers"); (2) WOW directors John Howenstein and Barry Margolis ("the Directors"); (3) WOW's auditor Deloitte & Touche (formerly Deloitte Haskins & Sells) ("Deloitte"); (4) WOW's underwriter, Smith Barney, Harris Upham & Co. ("Smith Barney"); and (5) WOW shareholders Josephine Abercrombie, Robinson Interests, Inc., and Worlds of Wonder Shares Partnership ("the Shareholders"). The plaintiffs claimed that the prospectus accompanying the offering ("the Debenture Prospectus") was false and misleading in violation of sections 11 and 12(2) of the Securities Act of 1933 ("1933 Act") and section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and that the Directors and Shareholders had engaged in insider trading in violation of section 10(b).

After a tortured five years of proceedings,[1] the district court granted summary judgment in favor of all defendants in an exhaustive opinion. *See In re Worlds of Wonder Sec.*

Litig., 814 F.Supp. 850 (N.D.Cal.1993) [WOW]. The court held that (1) with the possible exception of the audited 1987 financial statements, the Debenture Prospectus fully disclosed the risks of investing in WOW and that, as a result, under the "bespeaks caution" doctrine the document was not false or misleading as a matter of law; (2) even if the 1987 financial statements were false or misleading, all defendants had established affirmative defenses to section 11 liability; and (3) the plaintiffs had not established that any defendant acted with scienter sufficient to attach liability under section 10(b).

We conduct *de novo* review of the district court's grant of summary judgment. *E.g., Morris v. Newman (In re Convergent Technologies Sec. Litig.),* 948 F.2d 507, 512 (9th Cir.1991). In so doing, we are mindful that, "[a]lthough materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact, summary judgment may be granted in appropriate cases. Summary judgment may be defeated in a securities fraud derivative suit only by showing a genuine issue of fact with regard to a particular statement by the company or its insiders." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir.1992) (citations and quotations omitted).

## II.

We turn first to the plaintiffs' claims against the Officers, the Directors, Smith Barney, and Deloitte under section 11 of the 1933 Act, which creates a private right of action in favor of securities purchasers who rely upon a materially false or misleading prospectus. *See* 15 U.S.C. § 77k(a). The

1. *See In re Worlds of Wonder Sec. Litig.,* 694 F.Supp. 1427 (N.D.Cal.1988) (dismissing plaintiffs' complaint without prejudice for failure to comply with Federal Rule of Civil Procedure 9(b)) [WOW I]; *In re Worlds of Wonder Sec. Litig.,* 721 F.Supp. 1140 (N.D.Cal.1989) (dismissing in part plaintiffs' amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)) [WOW II]; *In re Worlds of Wonder Sec. Litig.,* 1989–90 Fed.Sec.L.Rep. (CCH) ¶ 95,004, 1990 WL 61951 (N.D.Cal.1990) (certifying plaintiffs' class as those who purchased WOW securities between June 20, 1986 and November 9, 1987) [WOW III]; *In re Worlds of Wonder Sec.Litig.,* 1990 Fed.Sec.L.Rep. (CCH) ¶ 95,689, 1990 WL 260675 (N.D.Cal.1990) (deny-

ing Shareholders' initial motion for summary judgment on the insider trading claims) [WOW IV]; *In re Worlds of Wonder Sec. Litig.,* 1992 Fed.Sec.L.Rep. (CCH) ¶ 97,018, 1992 WL 330411 (N.D.Cal.1992) (granting plaintiffs' motion to quash defendants' subpoenas of absent class members) [WOW V]; *In re Worlds of Wonder Sec. Litig.,* 147 F.R.D. 208 (N.D.Cal.1992) (denying Officers' motion to quash plaintiffs' subpoena to Securities Exchange Commission for documents from an investigation of WOW) [WOW VI]; *In re Worlds of Wonder Sec. Litig.,* 147 F.R.D. 214 (N.D.Cal.1992) (denying plaintiffs' motion to compel Deloitte to produce internal audit manuals) [WOW VII].

district court held that (1) except for possible errors in the certified 1987 financial statements that were appended to the document, "there are no statements in, or omissions from, the Debenture Prospectus that would give rise to an inference that any part of the document was false or misleading," *WOW*, 814 F.Supp. at 866, and (2) even assuming that the 1987 financial statements were false or misleading, each defendant had established an affirmative defense to section 11 liability as a matter of law.

### A.

■ In concluding that the "textual part" of the Debenture Prospectus was not false or misleading, the district court analyzed the plaintiffs' claims of misrepresentation under the rubric of the "bespeaks caution" doctrine:

> ... The doctrine holds that economic projections, estimates of future performance, and similar optimistic statements in a prospectus are not actionable when precise cautionary language elsewhere in the document adequately discloses the risks involved. It does not matter if the optimistic statements are later found to have been inaccurate or based on erroneous assumptions when made, provided that the risk disclosure was conspicuous, specific, and adequately disclosed the assumptions upon which the optimistic language was based....
>
> In the context of a summary judgment motion, ... [t]he doctrine holds that where a prospectus contains adequate cautionary language disclosing specific risks, no reasonable inference can be drawn that a statement regarding those risks was misleading.

*Id.* at 858, 859 (footnote omitted).[2] The court also analyzed the plaintiffs' claims in the context of information about WOW known to the market at the time of the offering:

> ... [T]he major rating agencies classified [WOW's] debentures as "junk bonds." That this fact was widely disseminated throughout the market is reflected by the 9% interest rate for the debentures, which was substantially higher than the market rate for lower risk securities.
>
> Since WOW was widely considered in the marketplace to be a risky investment, Plaintiffs' allegations that statements in or omissions from the Debenture Prospectus were misleading deserve especially careful scrutiny....

*Id.* at 864.

On appeal, the plaintiffs contend that the district court erred by adopting and applying the bespeaks caution doctrine and by granting summary judgment despite evidence indicating that the textual part of the Debenture Prospectus contained material misstatements and omissions. We consider these contentions in order.

### 1.

"The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." Donald C. Langevoort, *Disclosures that "Bespeak Caution"*, 49 Bus.Law. 481, 482–83 (1994) [*Disclosures*]. At least six circuits have adopted some form of the doctrine. *See Rubinstein v. Collins*, 20 F.3d 160, 166–68 (5th Cir.1994);

---

2. Noting that, "[i]f the documents are completely silent on a matter, the 'bespeaks caution' doctrine is inapplicable [because] [o]ne cannot simultaneously bespeak caution on a subject and not address it," the district court applied the *Basic* test of materiality to the plaintiffs' claims that the Debenture Prospectus omitted material information: "[F]or nondisclosure to be actionable 'there must be a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available.'" *WOW*, 814 F.Supp. at 859 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988) (emphasis added)).

The court subsequently paraphrased the *Basic* test in imprecise terms, indicating that the alleged omissions would be material only if "a reasonable investor would have felt the information *necessary* in deciding whether to invest in WOW." *Id.* at 859 (emphasis added). The plaintiffs claim this error (substituting "necessary" for "important") mandates reversal. We disagree. The plaintiffs point to no *application* of an incorrect materiality standard and, as a result, the court's misstatement was harmless.

*Kaufman v. Trump's Castle Funding (In re Donald J. Trump Casino Sec. Litig.),* 7 F.3d 357, 371–73 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 949 F.2d 243, 245–46 (8th Cir.1991); *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 763 (2d Cir.1991); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 (1st Cir.1991). Moreover, since the district court's opinion in this case, several trial courts in this circuit have also embraced the doctrine. *See In re Quarterdeck Office Sys., Inc. Sec. Litig.,* 854 F.Supp. 1466, 1471 (C.D.Cal.1994); *Forrester v. Microtest, Inc.,* 1993 Fed.Sec.L.Rep. (CCH) ¶ 98,072, 1993 WL 616688 (D.Ariz.1993); *In re Allergan Inc. Sec. Litig.,* 1993 Fed.Sec.L.Rep. (CCH) ¶ 98,066, 1993 WL 623321 (C.D.Cal.1993); *cf. Wade v. Industrial Funding Corp.,* 1993 Fed.Sec.L.Rep. (CCH) ¶ 98,144, 1993 WL 650837 (N.D.Cal.1993) (recognizing the doctrine but holding it inapplicable to the facts of the case); *Anderson v. Clow,* 1993 Fed. Sec.L.Rep. (CCH) ¶ 97,807, 1993 WL 497212 (S.D.Cal.1993) (same).

Despite this wealth of authority, the plaintiffs breathlessly attempt to portray the bespeaks caution doctrine as a radical departure from settled law and as contrary to the letter and spirit of federal securities statutes. In reality, it is neither. Rather, the doctrine, when properly construed, merely represents the pragmatic application of two fundamental concepts in the law of securities fraud: materiality and reliance. The Fifth Circuit recently explained:

> The "bespeaks caution" doctrine ... reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law, an evolution driven by the increase in and the unique nature of fraud actions based on predictive statements. In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus, the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—af-

fecting the reasonableness of reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine reflects the unremarkable proposition that statements must be analyzed in context.

*Rubinstein,* 20 F.3d at 167 (footnotes omitted). *Accord Trump Casino,* 7 F.3d at 364 ("[The doctrine] represents new nomenclature rather than substantive change in the law."); *see generally Disclosures,* 46 Bus. Law. at 487 (explaining materiality and reliance components of the doctrine).

In this light, the district court's measured application of the bespeaks caution doctrine was entirely consistent with the above-noted authority and established Ninth Circuit precedent. *See McGonigle v. Combs,* 968 F.2d 810, 817 (9th Cir.) (affirming summary judgment in favor of defendants where "no rational jury could find the comparative figures [in the prospectus] to have been material in light of their openly hypothetical nature and the specific disclaimers" in the document), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992); *Convergent Technologies,* 948 F.2d at 515, 516 (holding that a prospectus was not materially misleading because it "virtually overflows with ... repeated emphasis of significant risk factors"); *cf. Trump Casino,* 7 F.3d at 371 (interpreting *Convergent Technologies* as "applying but not explicitly referring to the bespeaks caution doctrine"); *Moorhead,* 949 F.2d at 246 (same).

In this case, the district court applied the doctrine narrowly:

> ... [A]n overbroad application of the doctrine would encourage management to conceal deliberate misrepresentations beneath the mantle of broad cautionary language. To prevent this from occurring, the bespeaks caution doctrine applies only to precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus. By contrast, blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim.

*WOW,* 814 F.Supp. at 858 (citations and quotations omitted); *see Kline v. First W. Gov't*

*Sec., Inc.,* 24 F.3d 480, 489 (3d Cir.1994) ("application of the 'bespeaks caution' doctrine ... requires that the language bespeaking caution relate directly to that to which plaintiffs claim to have been misled"). As a result, notwithstanding the plaintiffs' shrill arguments to the contrary, the court's context-specific approach entirely comports with *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), in which the Supreme Court noted that "[w]hile a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil.... [Therefore,] publishing accurate facts ... can render a misleading proposition too unimportant to ground liability," *id.* at 1097, 111 S.Ct. at 2760–61; *see Rubinstein,* 20 F.3d at 167–68 & nn. 26–27; *Trump Casino,* 7 F.3d at 372–73 & nn. 14–16 ("we believe that our approach comports with the Supreme Court's reasoning in *Virginia Bankshares*"); *Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir.1993) ("*Virginia Bankshares* contemplates a weighing of the true with the untrue statements ... for liability to result").

■ In our view, the bespeaks caution doctrine helps "to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement." *Romani,* 929 F.2d at 878 (quotation omitted); *see generally Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975) ("in the field of federal securities laws governing disclosure of information[,] even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as [the plaintiff] may prevent the suit from being resolved against him by dismissal or summary judgment"). Therefore, because it is consistent both with precedent from this

circuit and with well-settled principles of securities law articulated by courts across the country, we adopt the district court's formulation of the doctrine.[3]

**2.**

Turning to the merits, the plaintiffs claim the textual disclosures in the Debenture Prospectus were false or misleading in four general areas: liquidity, internal controls, revenue recognition, and sales performance. We consider each in order.

**a.**

[6] The plaintiffs first contend that the prospectus was false and misleading because it stated that WOW expected to have sufficient cash to operate through March 31, 1988. The prospectus made the following disclosures regarding liquidity:

*Seasonality of Quarterly Results....* There can be no assurance that the Company can maintain sufficient flexibility with respect to its working capital needs, manufacturing capacity and supplies of raw materials, tools and components to be able to minimize the adverse effects of an unanticipated shortfall in seasonal demand....

*Capital Requirements....* To meet seasonal working capital requirements, the Company has borrowed, and expects to continue to borrow, substantial amounts.... The Company anticipates that the proceeds of this offering, together with cash flow from operations, existing lines of credit and new bank credit facilities presently being negotiated, will provide sufficient funds to meet the Company's capital needs through March 31, 1988. However, if the Company is unable to obtain adequate capital from this offering and such new bank credit facilities on acceptable terms, its operations would be adversely affected....

*Liquidity and Capital Resources.* Since its inception, the Company's internally

---

3. The plaintiffs appear to contend that, if the bespeaks caution doctrine is viable, it applies only to section 10(b) claims and not to section 11 claims. This argument is plainly wrong. As noted, the doctrine is primarily an application of the materiality concept, which applies equally to both statutory provisions. *E.g., Halkin v. Veri-*

*Fone Inc. (In re VeriFone Sec. Litig.),* 11 F.3d 865, 868–69 (9th Cir.1993). Accordingly, courts have applied the doctrine to section 11 claims as well as section 10(b) claims. *See, e.g., Trump,* 7 F.3d at 365; *I. Meyer Pincus,* 936 F.2d at 761; *see generally Disclosures,* 49 Bus.Law. at 483.

generated cash flow has not been sufficient to finance accounts receivable, inventory and capital equipment needs, as well as support growth....

To meet seasonal working capital requirements, management expects to continue to borrow substantial amounts under its bank line of credit and its import financing line, both of which it expects to replace or extend prior to expiration. Based on its current plan of operations, management anticipates that existing credit facilities and new bank facilities presently being negotiated, together with the proceeds of the offering of the Debentures and funds from operations, will be sufficient to meet the Company's short-term cash requirements through March 31, 1988.

After reviewing the document, the district court concluded that the prospectus "clearly bespoke caution on the serious risks WOW's liquidity crisis posed to investors.... Plaintiffs are not entitled to an inference that they were misled in the face of such disclosures." *WOW*, 814 F.Supp. at 866. We agree.

■ The plaintiffs argue that the prospectus was misleading because a reduction in size of the Debenture Offering (from $100 million to $80 million) rendered the proceeds inadequate and because WOW was so desperate for cash that the corporation became insolvent a mere sixteen days after the offering closed. Neither contention is supported by the evidence. Regarding the reduction in size, the plaintiffs presented no evidence that, at the time of the offering, it was foreseeable that $80 million would be insufficient to enable WOW's continued operations. The defendants, on the other hand, introduced evidence indicating that the reduced amount was sufficient to meet all projected capital needs. In fact, Smith Barney specifically analyzed WOW's capital requirements based on an assumption of a $75 million offering and found that lower figure to be sufficient.

Similarly, no evidence supports the plaintiffs' claim that WOW "ran out of cash" immediately after the offering. The plaintiffs cite a memorandum by WOW's lender, First National Bank of Chicago ("First Chicago"), indicating that the corporation had exhausted its credit line shortly after the offering. That memorandum, however, does not prove what the plaintiffs suggest. It was known that WOW would need to continue to borrow after the infusion of capital. The Debenture Prospectus specifically disclosed that the corporation would continue to draw on the credit line, and in fact, several months after the offering and after conducting its own independent investigation, First Chicago renewed the line. Had WOW been insolvent, one would not expect the bank to have extended further credit. The plaintiffs make much of another allegedly damaging memorandum in which a WOW officer speculated that the corporation might suffer significant cash shortfalls in late 1987. That document, however, is not very probative because the officer wrote it *after* the Debenture Offering, apparently for the sole purposes of detailing scenarios for "contingency planning."

Given the plaintiffs' lack of probative evidence and the Debenture Prospectus' specific references to WOW's continuing cash shortfall and borrowing requirements, the district court was correct to conclude that the prediction of liquidity was not materially misleading as a matter of law. *See Trump Casino*, 7 F.3d at 369 ("The prospectus at issue contained an abundance of warnings and cautionary language which bore directly on the prospective financial success of the [casino] and on the [venture]'s ability to repay the bonds.... [D]ue to the disclaimers and warnings ..., no reasonable investor could believe anything but that the [casino] represented a rather risky, speculative investment which might yield a high rate of return, but which might alternatively result in no return or even a loss."); *Moorhead*, 949 F.2d at 245–46 & n. 2 (no material misrepresentation by projecting that a proposed venture would generate sufficient revenue to service offered bonds where there were "repeated, specific warnings of significant risk factors"). We therefore affirm the summary judgment on this issue.

**b.**

■ The plaintiffs next argue that the following Debenture Prospectus description of WOW's internal controls was materially misleading:

*Information Systems and Control Procedures.* The Company's business has grown dramatically in the last year, and the Company's development of its management information system and other systems and control procedures has at times lagged behind this growth. While the Company continues to upgrade its systems, procedures and controls to meet the demand of its expansion, there can be no assurance that the Company can successfully implement these enhancements or that these enhancements will keep pace with the growth.

The plaintiffs contend that, in fact, WOW's internal controls at the time of the offering had "crippling deficiencies" and that "no reasonable investor reading the Prospectus would have concluded that there were any *existing* problems with controls." The district court disagreed: "Plaintiffs ignore the fact that the Prospectus included an express disclaimer that 'there can be no assurances' that WOW's existing internal controls would continue to be adequate given the rapid pace at which the company was growing. The Prospectus made no predictions to the contrary. Thus, the Prospectus adequately bespoke caution regarding this potential risk to WOW's investors. As a matter of law, Plaintiffs cannot have been misled." *WOW,* 814 F.Supp. at 865. This conclusion is correct for several reasons. First, contrary to the plaintiffs' assertions, the Debenture Prospectus did not state or imply that WOW's internal control problems were "in the past" and not ongoing. Rather, the prospectus clearly warned that the company's attempt to improve internal controls could prove to be inadequate. Second, the plaintiffs presented no evidence that WOW's internal controls at the time of the offering were materially deficient. Indeed, the allegedly "devastating" management letter issued by Deloitte (two-and-a-half months *after* the Debenture Offering) concluded that, although "significant problems" existed, WOW's internal controls had no material weaknesses. And, third, WOW probably would not have needed to disclose even serious internal-control deficiencies. *Cf. Monroe v. Hughes,* 31 F.3d 772, 776 (9th Cir.1994) (holding that an auditor need not disclose internal controls).

The Debenture Prospectus, which noted that WOW had struggled to maintain sufficient internal controls, clearly erred on the side of *over* disclosure and was therefore not misleading. We affirm the district court on this point.

**c.**

The plaintiffs next argue that the Debenture Prospectus was misleading because it failed to disclose that WOW engaged in various tactics to "pump up" revenue figures without completing actual sales. Specifically, the plaintiffs contend the prospectus misleadingly omitted WOW's observance of "price protection" (the right to reimbursement in the event of post-sale price reductions), "stock balancing" (the post-sale right to exchange non-defective products for different merchandise), and "guaranteed sales" (the unqualified right to return non-defective products).

■ The argument regarding price protection and stock balancing is without merit for several reasons. First, the plaintiffs introduced "no evidence that, at the time of the Debenture offering, WOW's management could have foreseen that WOW would have to reduce prices to [the extent it actually did so in late 1987]. Thus, the alleged practice of price protection did not pose a foreseeable risk to WOW's investors at the time of the Debenture offering, so WOW had no duty to disclose it." *WOW,* 814 F.Supp. at 865. The speculative impact of future exchanges and price reductions was not material. *See Hanon,* 976 F.2d at 506 ("potential action to be taken sometime in the distant future is not an item appropriately made a part of a public disclosure because of its speculativeness"). And, second, the plaintiffs concede that price protection is a common practice in the toy industry. The undisputed evidence also indicates that stock balancing is commonplace in the industry. As a result, WOW had no duty to disclose its observance of those practices. *See Hanon,* 976 F.2d at 505 (no duty to disclose a "known condition"); *Convergent Technologies,* 948 F.2d at 513 (no duty to disclose a risk "the market clearly understood"); *Schneider v. Vennard (In re Apple Computer Sec. Litig.),* 886 F.2d 1109, 1119

(9th Cir.1989) (no duty to disclose the fact that buyers could cancel orders at will because "it was well understood within the investment community that computer orders are 'soft'"), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1220 (9th Cir.1980) ("[i]t is not a violation of any securities laws to fail to disclose a result that is obvious").

▮▮▮ Although a slightly closer call, the plaintiffs' contention regarding guaranteed sales fares no better. We agree that a company that "substantially overstate[s] its revenues by reporting consignment transactions as sales . . . mak[es] false or misleading statements of material fact." *Malone v. Microdyne Corp.,* 26 F.3d 471, 478 (4th Cir. 1994). And we acknowledge that the plaintiffs did present some evidence that WOW engaged in guaranteed sales prior to the Debenture Offering, particularly in the final quarter of fiscal 1987.

The evidence indicates, however, that Deloitte analyzed WOW's sales practices and concluded that, "[w]hile it is true that on a few occasions prior to the 1987 audit, WOW made the business decision to permit customers to return or exchange nondefective products, these returns were minimal in number, and did not have a material impact on WOW's financial statements taken as a whole." As the district court noted, "[j]ust because some of WOW's customers were allowed a refund does not mean that . . . WOW had a practice of offering guaranteed sales to all its customers. Giving an unsatisfied customer a refund is a normal business method of dealing with an unsatisfied customer. It is not a violation of securities laws for WOW to fail to disclose such an obvious practice to potential investors." *WOW,* 814 F.Supp. at 862.

The plaintiffs' evidence of guaranteed sales is speculative, nebulous, and nowhere purports to quantify the degree to which WOW engaged in this "normal business" practice. As such, it does not rise to the level of a material omission. *Cf. Malone,* 26 F.3d at 478 (expert testimony specifically indicated that the company's undisclosed consignment sales accounted for thirteen percent of total revenue and made financial statements "not only misleading, but misleading in a material

way"). The plaintiffs cannot defeat summary judgment merely by accusing WOW of trying to post favorable financial figures. *See Convergent Technologies,* 948 F.2d at 515 ("[P]laintiffs do not explain why [the issuer] would want to exclude such [one-time] sales. Plaintiffs suggest [the issuer] made the sales in the fourth quarter to post better numbers on its year-end financials and thus further its scheme to inflate its stock price. Plaintiffs provide no evidence to support this suggestion."); *Vaughn,* 628 F.2d at 1221 ("Corporate officials are under no duty to disclose their precise motive or purpose for engaging in a particular course of action, so long as the motive is not manipulative or deceptive").

We therefore conclude the district court correctly held that the Debenture Prospectus was not misleading on this issue.

**d.**

Finally, the plaintiffs argue that the following Debenture Prospectus disclosures misstated WOW's performance in the first quarter of fiscal 1988 and generally hid the fact that, at the time of the Debenture Offering, sales of and demand for WOW products had declined precipitously:

*Seasonality of Quarterly Results. . . .* The Company anticipates that net sales for the quarter ending June 30, 1987 will be less than those for each of the prior three quarters, and the Company expects to report a loss for the quarter. . . .

*Net Sales. . . .* Because sales of toys are highly seasonal, the Company would generally expect net sales to be lower in the first half of the calendar year. The Company's net sales in the first quarter of fiscal 1987 were lower than net sales in each of the preceding two quarters. Similarly, the Company expects net sales for the first quarter of fiscal 1988 to be lower than sales for each of the prior three quarters. At the same time, the Company is continuing to expand its operations in anticipation of the Christmas selling season. As a result, the Company expects to report a net loss for the first quarter of fiscal 1988 proportionally greater than the net loss reported for the first quarter of fiscal 1987.

The plaintiffs contend the prospectus was misleading because it did not state that (1) WOW's performance in the first quarter (which ended a month *after* the Debenture Offering) would be "substantially" lower than the first quarter of the preceding year or (2) WOW's net quarterly loss would be "disproportionally greater" than that of the prior year. We reject this argument for several reasons.

First, as Smith Barney explains, "[t]he only reasonable reading [of the prospectus] is that, in light of the *lower* first quarter sales and the *higher* first quarter operating expenses the company was then expecting, WOW's net loss ... was expected to constitute a 'greater proportion' of net revenue than ... during the first quarter of 1987." The prospectus did not imply that WOW's first quarter 1988 losses would be proportional to its first quarter 1987 losses.

Second, the prospectus clearly warned that WOW expected lower net sales. WOW was under no duty to disclose the precise extent of the anticipated revenue drop. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (en banc) ("Disclosing that [a product] was being sold below cost was not misleading by reason of not disclosing how much below."). The plaintiffs complain that the prospectus failed to disclose the extent to which first quarter sales lagged behind WOW's internal projections. The quarter, however, was not yet complete; had WOW actually disclosed its internal business plan, the plaintiffs probably would now be contending that no basis existed for such a prediction. *Cf. Convergent Technologies*, 948 F.2d at 516 ("It is just good general business practice to make ... projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public.") (quotation omitted).

The plaintiffs also argue that the Debenture Prospectus violated section 11 by failing generally to reveal "WOW's crisis of sales and demand." The district court disagreed: "Plaintiffs submit no admissible evidence to show that WOW's sales had decreased so dramatically at the time of the Debenture offering that WOW's management could have known about, and thus would have had a

duty to disclose, the impending collapse of Lazer Tag sales. Plaintiffs cannot use the benefit of 20–20 hindsight to turn management's business judgment into securities fraud." *WOW*, 814 F.Supp. at 865. We agree.

The plaintiffs argue that WOW's sales, for Lazer Tag in particular, began a dramatic collapse in January 1987 and that, because revenues prior to the Debenture Offering fell below WOW's internal business plan, WOW was required to disclose that "fact" in the Debenture Prospectus. The prospectus, however, fully disclosed WOW's sales for each of the eight completed fiscal quarters of its existence (through March 31, 1987). This disclosure revealed a significant decline in both net sales and net income for the first three months of 1987. The plaintiffs' complaint that WOW should have disclosed the ramifications of that drop in sales (*i.e.*, that the decline was due to more than "normal seasonality") is without merit. *See Convergent Technologies*, 948 F.2d at 513 ("The challenged statements do not imply any comparison between the rate of past and future growth. They simply report past performance and assert specific limited predictions for the future."); *see generally Trump Casino*, 7 F.3d at 375 ("The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably.").

Perhaps realizing this, the plaintiffs concentrate their argument on the not-completed first quarter of fiscal 1988. As noted above, the Debenture Prospectus disclosed that WOW would suffer a net loss in that quarter. Nevertheless, the plaintiffs argue that the corporation should have informed investors that demand for its products was, in fact, "dead." The evidence, however, indicates that all interested parties (including the Officers, Smith Barney, and WOW's retailers) anticipated that WOW's products would again sell well in fiscal 1988. Although first quarter sales were disappointing, the parties reasonably discounted WOW's performance in the first two months of that quarter as being relatively inconsequential. Indeed, WOW projected those two months to account

for only four percent of its revenue for the year.

■ Just four days prior to the Debenture Offering, WOW commenced a production schedule implementing the corporation's optimistic business plan, which projected $542 million in sales. As the Officers note, if demand actually had dried up, the "[p]laintiffs cannot explain why WOW's entire senior and middle management would have lied to themselves about the Company's business outlook." *See Apple Computer,* 886 F.2d at 1117 ("[the corporation]'s massive investment in [a new product] demonstrates this good faith" belief that it will succeed). The plaintiffs presented no admissible evidence to the contrary.[4] In sum, their argument distills to a contention that WOW should have predicted the collapse in sales that occurred in late 1987, long after the Debenture Offering. The corporation had no duty to do so. *See VeriFone,* 11 F.3d at 869 ("These alleged nondisclosures are, in substance, failures to make a forecast of future events. Put another way, what the complaint states is that [the issuer] omitted to state the 'fact' that future prospects were not as bright as past performance. Absent allegations that [the issuer] withheld financial data or other existing facts from which forecasts are typically derived, the alleged omissions are not of material, actual facts. Therefore, the forecasts need not have been disclosed, and the failure to make the omitted forecasts did not render the other statements that were made misleading."). We affirm the district court on this point.

**e.**

The avalanche of documents presented by the plaintiffs does little more than illustrate the fact that, at the time of the Debenture

Offering, WOW's future was uncertain. The Debenture Prospectus adequately disclosed this fact and the market, which characterized the debentures as "junk bonds," realized it. As a result, we agree with the district court's summary of the plaintiffs' section 11 case:

> When a company fails, it does not automatically mean that a violation of the securities laws has occurred. There are a number of risks involved whenever one invests in any company.... The securities laws do not insulate investors against stock downturns which are caused by events not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased the securities.
>
> In this case, WOW's investors took a gamble, as do all investors. They lost. Holders of shares and Debentures knew that WOW was not a diversified company. Its success was based on only two major products.... And, WOW's precarious cash position was not concealed from these investors.... It was obvious to any reasonable investor that if either of WOW's two products were to lose favor with consumers, the company would be devastated....
>
> Plaintiffs have submitted hundreds of pages to this court in an effort to create a genuine issue of fact. Using tortured reasoning, convolution of the issues, and the benefit of hindsight, they point to the most innocuous of optimistic language, and the most immaterial of omitted facts, and claim that they were somehow misled as to the nature of their investment. [That is not sufficient].

---

4. The plaintiffs did submit the declaration of John Forsythe, a former WOW collections manager, who stated that "I understood that it was common knowledge among the WOW sales personnel ... that demand for products in the Lazer Tag line had collapsed" and that "I understood on the basis of my conversations with WOW sales personnel ... that the 'pipelines were stuffed' with Lazer Tag kits." The district court, however, excluded this evidence because "Forsythe had no responsibility for WOW's sales, so he has no personal knowledge of this fact and could not testify to it at trial. If he were to testify to the

fact that various retailers told him sales were poor, it would be inadmissable hearsay." *WOW,* 814 F.Supp. at 865 n. 12.

This ruling was not an abuse of discretion. *See McGonigle,* 968 F.2d at 818 n. 6 ("Evidentiary rulings are not reversible absent clear abuse of discretion."); *In re Convergent Technologies Second Half 1984 Sec. Litig.,* No. C–85–20130–SW, 1988 WL 215412 (N.D.Cal. Jan. 10, 1990) (excluding as hearsay the declaration of a company's former collections officer regarding "false sales ... to inflate the stock price"), *aff'd mem.,* 942 F.2d 791 (9th Cir.1991).

*WOW,* 814 F.Supp. at 873. We affirm the district court's summary judgment in favor of the defendants regarding the textual part of the Debenture Prospectus.

## B.

As noted above, the district court recognized that the "[p]laintiffs allege numerous errors in the financial statements for 1987, included in the back pages of the Debenture Prospectus," *WOW,* 814 F.Supp. at 864 (footnote omitted), and, as a result, decided to "conserv[e] judicial resources by assuming *arguendo* that the statements are in error, because summary judgment for defendants is clearly appropriate on other grounds," *id.* at 867 n. 13. We conclude that the "other grounds" on which the district court relied were sufficient to support summary judgment for all defendants except Deloitte.

### 1.

■ Because the audited 1987 financial statements were "certified" by Deloitte within the meaning of section 11, every defendant other than the auditor can escape section 11 liability for the statements by establishing that they "had no reasonable ground to believe and did not believe ... that the ["expertised"] statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C). *E.g., In re Software Toolworks, Inc. Sec. Litig.,* 789 F.Supp. 1489, 1498 (N.D.Cal.1992), *appeal dismissed,* 16 F.3d 1073 (9th Cir.1994). The district court held that all defendants had proven this "reliance" defense:

> ... [T]he issues are enormously complex on the question of whether Deloitte's recognition of revenues was in accordance with the standards of the accounting profession. The parties have generated well over 100 pages of conflicting expert testimony on these issues alone. It is absurd in these circumstances for Plaintiffs to suggest that the other defendants, who are not accountants, possibly could have known of any mistake by Deloitte. Therefore, even if there are errors in the financial statements, no defendant except Deloitte

can be liable under section 11 on that basis.

*WOW,* 814 F.Supp. at 863–64. We agree.

The plaintiffs contend that the Officers, the Directors, and Smith Barney cannot invoke section 11's reliance defense because they "not only knew of the transactions which caused WOW's audited financial statements to be [allegedly] false and misleading, but actively structured and participated in those transactions." This argument entirely misses the point of the district court's ruling.

As the court recognized, "[p]laintiffs have admitted that WOW's management made full disclosure to Deloitte of all relevant information regarding the questioned transactions." *WOW,* 814 F.Supp. at 864. After disclosing the nature of the transactions, the defendants relied on Deloitte's *accounting decisions* (to permit revenue recognition) about the sales. Those expert decisions, which underlie the plaintiffs' attack on the financial statements, represent precisely the type of "certified" information on which section 11 permits non-experts to rely. *See Software Toolworks,* 789 F.Supp. at 1498 ("Given the complexity of the accounting issues, the Underwriters were entitled to rely on Deloitte's expertise.").

We therefore affirm the district court's conclusion that all defendants except Deloitte were immunized from section 11 liability for errors in the 1987 financial statements.

### 2.

■ Regarding Deloitte, the district court concluded that the auditor had established a "loss causation" defense:

> Damages for a Section 11 violation are measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the Section 11 claim was filed. *See* 15 U.S.C. § 77k(e). Section 11(e), however, provides that:
>
> > [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value ... resulting from such part of the registration statement[ ] with respect to which his liability is being asserted, ... such

portion or all of such damages shall not be recoverable.

*Id.* The defendant has the burden of proof on this defense. *Id.* Though it has been recognized by courts as a "heavy burden," it is not insurmountable, and courts have awarded summary judgment to the defendant in appropriate cases. *See In re Fortune Sys. Sec. Litig.,* 680 F.Supp. 1360, 1364–65 (N.D.Cal.1987).

This is such a case. It is obvious to any investor that WOW's securities declined in value because the company was barely liquid and faced declining sales for its products, not because its financial statements may have been in error. Plaintiffs have absolutely no evidence to show that any part of the Debenture's decline in value was caused by Deloitte's alleged accounting errors. There was no disclosure of these errors (if indeed there were any errors) to the public at any time before this lawsuit was initiated. Since the marketplace never knew of any alleged accounting errors, the alleged errors cannot be said to have had any effect on the Debentures' market value.

*WOW,* 814 F.Supp. at 866–67. Because this analysis is based upon the faulty premise that Deloitte's alleged errors needed to be disclosed to the market before section 11 liability could attach, we reverse the summary judgment on this issue.

To establish a "loss causation" defense under section 11(e), Deloitte needed to prove "that the depreciation in value [of the debentures] resulted from factors other than the [alleged] material misstatement in the [1987 financial] statement." *Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 340 (2d Cir.1987). *Accord, e.g., Fortune Sys.,* 680 F.Supp. at 1364. The district court concluded that Deloitte met this burden by showing that WOW never disclosed to the market the fact that the 1987 financial statements contained material errors. This analysis was, quite simply, far too narrow.

■ Loss causation exists where "the misrepresentation *touches upon* the *reasons* for the investment's decline in value." *McGonigle,* 968 F.2d at 821 (emphasis added) (quotation omitted) (section 10(b) case). *Accord, e.g., Fortune Sys.,* 680 F.Supp. at 1365 (section 11 case); *see generally Securities*

*Investor Protection Corp. v. Vigman,* 908 F.2d 1461, 1468 (9th Cir.1990) ("what securities lawyers call 'loss causation' *is* the standard common law fraud rule" of "proximate causation") (quotation omitted) (section 10(b) case), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *cf. Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1332 (8th Cir.1991) ("all the Class needed to show [to establish 'loss causation'] was that the [issuer]'s bankruptcy was somehow '*related*' to Arthur Young's nondisclosure") (emphasis added) (section 10(b) case), *aff'd,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The district court's application of section 11(e) ignores the broad nature of the "loss causation" determination. Indeed, the plaintiffs rightly note that, if correct, "[t]he district court's interpretation would eviscerate the statute. Companies and their auditors could immunize themselves from § 11 liability for false and even fraudulent financial statements simply by refusing to admit their falsity (or refusing to include in their adverse public disclosures information that would 'clue in the market' to their falsity) prior to the time a § 11 suit is filed."

■ Under the correct inquiry, summary judgment was clearly inappropriate in this case. As Deloitte acknowledges, "the decline in the value of WOW's investment securities ... corresponded precisely to a series of fiscal 1988 public disclosures." The plaintiffs introduced expert testimony that those disclosures *directly related* to the transactions for which Deloitte allegedly made erroneous accounting determinations, and that, as a result, Deloitte's alleged errors "touched upon" the reasons for the decline in the value of WOW's debentures. Several examples are illustrative:

> * The plaintiffs allege that Deloitte improperly recognized revenue on 1987 "sales" for which WOW offered price protection. WOW's subsequently announced losses for the second quarter of fiscal 1988 included a $13.2 million reserve for price protection in connection with the 1987 transactions. Following disclosure of those losses, the market price of the debentures declined.

\* The plaintiffs allege that Deloitte improperly recognized revenue on the 1987 "K–Mart Transaction," in which WOW offered the retailer extended payment terms, stock balancing, and guaranteed sales. When WOW subsequently announced losses for the second quarter of fiscal 1988, including a $9.9 million charge for K–Mart's cancellation of the "sales," the market price of the debentures declined.

\* The plaintiffs allege that Deloitte improperly failed to account for WOW's excess and obsolete inventory. When WOW subsequently announced losses for the second quarter of fiscal 1988, including the creation of a $12 million inventory reserve, the market price of the debentures declined.[5]

In light of that evidence, the auditor clearly did not overcome, as matter of law, "Congress' desire to allocate to the defendants the risk of uncertainty in [section 11(e) ] cases." *Akerman,* 810 F.2d at 341.[6] We therefore reverse the district court's holding that Deloitte established a "loss causation" defense as a matter of law and remand for a trial on the merits of (1) whether the 1987 financial statements were in fact misleading (an issue not decided by the court) and (2) whether

Deloitte can affirmatively establish a loss causation defense.

### III.

The plaintiffs asserted claims against Smith Barney under section 12(2) of the 1933 Act, which imposes additional liability on parties who sell securities with a false or misleading prospectus. *See* 15 U.S.C. § 771(2). The district court concluded that the plaintiffs' claims were meritless:

> The analysis this court applied to Plaintiffs' Section 11 claims ... applies equally to Plaintiffs' claims under Section 12(2). This court repeats its holding that there are no material omissions from the prospectus, aside from possible errors in the 1987 financial statements....

> Regarding the alleged errors in the 1987 financial statements, ... Smith Barney specifically sought and received assurances from Deloitte on the facts that supported Deloitte's decision to recognize revenue on the questioned transactions. Thus, Smith Barney clearly exercised reasonable care, and it did not have reason to know that

**5.** The district court said that it "failed to see the logic in plaintiffs' argument [on the loss causation issue]. The amount of revenue posted by a company during a prior year is a number that exists only on paper to reflect total sales during that year. The amount of actual cash the company has access to at the moment is not necessarily related to its total sales in the previous year.... The market [therefore] would not interpret WOW's running out of cash as a signal that its revenues for the previous year were overstated." *WOW,* 814 F.Supp. at 877.

Although undoubtedly true, the court's observations are wholly inapposite to the plaintiffs' argument. The plaintiffs contend that Deloitte's alleged errors directly affected the market price of the debentures by causing the creation of reserves to account for "false sales" and, in some cases, actually enabling WOW to consummate transactions it otherwise never would have attempted. That contention states a direct correlation between the alleged misstatements (faulty revenue recognition) and the loss (the decline in debenture price) and, accordingly, is sufficient to nullify Deloitte's "loss causation" defense on summary judgment.

**6.** The plaintiffs also introduced evidence that Deloitte's alleged misrepresentations artificially inflated the offering price of the debentures.

"Properly applied, the concept of loss causation will permit the plaintiff to recover only that damage caused by the misrepresentation: the amount paid over the true value." *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 650 F.Supp. 1346, 1354 (W.D.Wash.1986). *See McGonigle,* 968 F.2d at 821 (loss causation exists where "the alleged omissions adversely affected the objective value of the[ ] investment"); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1437 (9th Cir.1987) (plaintiff may recover "the difference between the purchase price and the value of the stock at the date of purchase") (quotation omitted). Deloitte argued that this "artificial inflation" analysis, which has arisen in section 10(b) cases, is inconsistent with section 11(e), and the district court agreed. *See WOW,* 814 F.Supp. at 875–77.

Although we do not decide this issue because a remand is appropriate for other reasons, we do note that section 11(e) specifically provides that loss causation exists where a "depreciation in value" "result[s]" from a misleading statement in a prospectus. Although no court has considered section 11 loss causation in the manner urged by the plaintiffs, neither Deloitte nor the district court cited any authority purporting to disregard the plain statutory language in such a case.

there were any errors in the financial statements.

*WOW*, 814 F.Supp. at 867–68. We agree.

As noted above, the textual part of the Debenture Prospectus contains no material misstatements or omissions. Accordingly, Smith Barney has no section 12(2) liability for those disclosures.

 Regarding the 1987 financial statements, we conclude that the plaintiffs waived their right to appeal the district court's determination that Smith Barney established a "due diligence" defense. In their eighty-page opening brief, the plaintiffs' only reference to section 12(2) was in a footnote, alleging that "[a]ll arguments asserted herein with respect to the § 11 claim against Smith Barney are applicable to the § 12(2) ... claims against this defendant." Nowhere in their brief, however, did the plaintiffs discuss "due diligence." Indeed, even in their reply brief, the plaintiffs only mentioned due diligence with regard to the "textual parts of the Prospectus" and *not* with regard to the 1987 financial statements. This lack of argument waives an appeal of the issue. *E.g., Officers For Justice v. Civil Serv. Comm'n*, 979 F.2d 721, 726 (9th Cir.1992) ("We will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief.") (quotation omitted), *cert. denied*, — U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993).

We therefore affirm the district court's summary judgment in favor of Smith Barney on the section 12(2) claim.

### IV.

 Finally, the plaintiffs asserted claims against all defendants under section 10(b) and Rule 10b–5 of the 1934 Act, which provide liability for deceptive conduct in connection with the sale of securities. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To establish section 10(b) liability, the plaintiffs must show that the defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); *see Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir.1990) (en banc) (holding that recklessness constitutes

scienter under section 10(b)), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

### A.

The district court held that the plaintiffs had no section 10(b) claims based on the textual part of the prospectus because, "as a matter of law, there are no misleading statements in, or material omissions from, the Debenture Prospectus, aside from possible errors by Deloitte in the 1987 financial statements." *WOW*, 814 F.Supp. at 869. Because the standard of materiality is the same under section 10(b) as it is under section 11, *e.g., VeriFone*, 11 F.3d at 868–69, we affirm this conclusion for the reasons stated above.

### B.

The plaintiffs, however, also asserted section 10(b) claims based "on alleged fraudulent conduct by [some] defendants other than the [textual part of the] prospectuses." *WOW*, 814 F.Supp. at 869. The district court held that summary judgment was appropriate for all defendants on these claims because the plaintiffs could not establish scienter.

### 1.

 With regard to the Officers, the court concluded as follows:

... Plaintiffs allege in conclusory fashion that the Officer Defendants violated Rule 10b–5 by misleading "press releases, filings with the SEC, statements to analysts, etc." The Officers Defendants['] overall pattern of conduct, though, rebuts any inference of knowing or reckless conduct on their part. If WOW's officers were bent on committing fraud, it is not likely that they would have provided such detailed risk disclosure in the prospectuses. Furthermore, if, as Plaintiffs allege, the Officers knew that WOW was heading for financial disaster, they probably would have bailed out of their substantial holdings. Each of the Officer Defendants, by contrast, held onto most of their WOW

stock and incurred the same large losses as did the Plaintiffs themselves....

*Id.* at 869. We agree.

The plaintiffs produced no direct evidence of any scienter on the part of the Officers. Rather, the plaintiffs seek to rely on speculative inferences that arise from the Officers' allegedly suspicious conduct. The Officers, however, conclusively rebutted any· such inference that might have been permissible. *See generally DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.) ("The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud.... Because only a fraction of financial deteriorations reflects fraud, [however,] plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud."), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

The detailed risk disclosure in the Debenture Prospectus negates an inference of scienter. *E.g., Ferber v. Travelers Corp.,* 802 F.Supp. 698, 714 (D.Conn.1992) ("defendants' provision of adverse information to the public by way of disclosures negates an inference that they acted with an inten[t] to defraud") (quotation omitted); *see also DiLeo,* 901 F.2d at 629 ("People sometimes act irrationally, but indulging inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case."). Similarly, the Officers' minimal sales of stock also negates an inference of scienter. *See Apple Computer,* 886 F.2d at 1117 ("credible and wholly innocent explanations for the stock sales ... are sufficient to defeat any inference of bad faith").

Moreover, the Officers' post-offering efforts to continue WOW's expansion, including increased expenditures on advertising and product development, evince their good faith belief in WOW's prospects for success. *See id.* at 1118 ("Any remote inference of bad faith arising from the defendants' stock sales is completely dispelled by the defendants' overall pattern of conduct. Throughout the class period, the defendants continued to stake much of [the corporation]'s future on the success [of a new product], pouring millions of dollars into product development, market research, and promotions. At the same time, defendants retained the great bulk of their holdings, and held on in the face of a decline of almost 75% following disclosure of [the product]'s disappointing sales.... We cannot conclude that this conduct is so inconsistent·with the defendants' expressed optimism as to raise a triable issue regarding the defendants' good faith.").

We affirm the district court's conclusion that the plaintiffs had not established scienter on the part of the Officers.

### 2.

Consistent with its section 11 analysis, the district court recognized that issues of fact existed as to whether Deloitte was liable for material misstatements or omissions in the 1987 financial statements. The court held, however, that summary judgment was appropriate because Deloitte had not acted with scienter:

Deloitte has submitted evidence showing that it extensively investigated, carefully addressed, reasonably resolved, and thoroughly documented every transaction where Plaintiffs ·allege revenue was improperly recognized. Also, Deloitte submits the declarations of its accountants that recognition of the revenue was proper in accordance with Generally Accepted Accounting Principles ("GAAP")....

Plaintiffs respond ... with the declaration of [alleged expert] Albert Rossi.... Rossi's testimony, in substance, is that for everything Deloitte's accountants did, he would have done more, and that in his opinion, the revenues were improperly recognized ·under GAAP. Rossi concludes that "[t]he danger that Deloitte's audit opinion and the financial statements which Deloitte audited would mislead investors was so obvious that in my opinion, Deloitte must have been aware of it."

As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case. *Apple Computer,* 886 F.2d at 1116. "Howev-

er, where the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert.'" *Id.* An expert's conclusory allegations that a defendant acted with scienter are insufficient to defeat summary judgment where the record clearly rebuts any inference of bad faith. *See Software Toolworks,* 789 F.Supp. at 1504 n. 30.

Here, Rossi's conclusory opinion ... is not based on specific facts that shed light on the mental state of Deloitte's auditors.... Rather, Rossi is drawing his own conclusion based on a record that conclusively rebuts any inference of scienter.... As such, Rossi's opinion is more probative of Plaintiff's desperation to keep Deloitte, a "deep pocket," involved in this lawsuit than it is on the issue of whether Deloitte acted with scienter.

*WOW,* 814 F.Supp. at 870–71. We agree.

■ The plaintiffs presented no direct evidence that Deloitte acted with scienter. Nevertheless, the plaintiffs contend that summary judgment was inappropriate because their "expert" opined that Deloitte had done so. Inspection of the expert's declaration, however, reveals that he made an impermissible leap in logic to reach this conclusion.

Deloitte freely acknowledges that it had "full information" about the terms of the disputed transactions. Yet, as Deloitte explains, that knowledge is not dispositive:

... Deloitte knew many facts because it did a diligent audit. But the issue is not whether Deloitte knew facts about transactions; it is whether Deloitte had "actual knowledge" of a misrepresentation, or whether Deloitte's resolution of the accounting issues presented by those facts was such "an extreme departure" from reasonable accounting practice that it "knew or had to have known" that its conclusions would mislead investors. *Hollinger,* 914 F.2d at 1569. Rossi's disagreement with Deloitte's professional judgment does not meet that test.

In essence, the plaintiffs concede that Deloitte made a sufficient investigation into WOW's finances but contend that Deloitte's ultimate resolution of the accounting issues regarding those finances was incorrect.

That contention is not sufficient to establish scienter. "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Malone,* 26 F.3d at 479 (quotation omitted). *Accord, e.g., Vosgerichian v. Commodore Int'l,* 832 F.Supp. 909, 915 n. 8 (E.D.Pa.1993) ("The ... complaint charges that [the accountants] ... violated GAAP and GAAS, but clearly, even deliberate violations of those guidelines, without more, do not amount to fraud.") (collecting cases).

"[Scienter] requires more than a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (citations, quotations, and footnote omitted). As a result, Deloitte's evidence indicating that the accounting decisions were reasonable negates the plaintiffs' attempt to establish scienter. *See id.* at 1241 ("[The disputed] items involved complex issues of accounting as to which reasonable accountants could reach different conclusions. Indeed, ... the Court heard diametrically opposing views from experts as to the reasonableness of [the] accounting and audit judgments. It follows that no finding of fraud or recklessness can rationally be made in this case."); *Software Toolworks,* 789 F.Supp. at 1504 & n. 30 ("Plaintiffs ... second guess Deloitte's decision that a 44% reserve was appropriate—this is not enough to infer scienter in this case.... Nor are Plaintiffs' expert's conclusory statements sufficient to defeat summary judgment."); *cf. Fine v. American Solar King Corp.,* 919 F.2d 290, 296–98 (5th Cir.1990) (triable issue regarding scienter exists where plaintiffs directly established that accountants *knew* they had violated GAAP by issuing false statements), *cert. dismissed,* — U.S. —, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

Rossi's conclusory allegations do not change this analysis. In sum, his declaration

consists of self-righteous statements that, because Deloitte did not audit WOW as he would have done, Deloitte must have acted fraudulently. Such evidence is not sufficient. *See WOW*, 814 F.Supp. at 871 n. 15 ("this is not the first time that a district court has awarded summary judgment to an auditor on the scienter issue in the face of a declaration by Rossi"); *Software Toolworks*, 789 F.Supp. at 1504–10 (same).[7]

We affirm the district court's conclusion that Deloitte did not act with scienter.

### C.

 Finally, the plaintiffs argue that the Directors and the Shareholders violated section 10(b) by selling WOW securities with knowledge of undisclosed adverse, material information. A private right of action for insider trading exists under section 10(b) for persons who traded contemporaneously with the insider. *E.g., Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir.1993). To establish section 10(b) liability, however, the plaintiffs must prove that the insider traders acted with scienter. *E.g., Dirks v. SEC*, 463 U.S. 646, 663 & n. 23, 103 S.Ct. 3255, 3266 & n. 23, 77 L.Ed.2d 911 (1983). The district court exhaustively explained why the plaintiffs had not done so in this case:

> Plaintiffs assert that since these defendants sold some of their shares in WOW prior to WOW's financial collapse, they must have known of some information, not already known to the market, that signalled WOW's imminent doom. Plaintiffs' "evidence," though, consists of mere speculation and conclusory allegations....
>
> ... The evidence ... shows only that the opportunity for insider trading existed.... In this case, after years of discovery, Plaintiffs cannot point to any bit of information traded on by these defendants that was not already known to the market. This speaks to the merits of their claims.
>
> ... "Insider trading in suspicious amounts or at suspicious times is probative of scienter." *Apple Computer*, 886 F.2d at 1117. But in this case, when one considers the amounts traded, Plaintiffs' claims appear fantastic. These defendants sold only a portion of their holdings in WOW. Of course, an insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC. Here, however, Plaintiffs' allegation is essentially that these defendants possessed inside information on WOW's imminent collapse, so one would expect that they would have sold a good proportion of their holdings.
>
> On the contrary, most of these defendants sold only a minuscule fraction of their holdings in WOW, and ended up reaping the same large losses as did Plaintiffs when WOW collapsed....
>
> In sum, with this evidence, no reasonable jury could find that insider trading had occurred, or that these defendants acted with scienter.

*WOW*, 814 F.Supp. at 871–72. We agree.

Even if the evidence was sufficient to permit an inference that one or more of the defendants had access to inside information, the defendants' actual trading would conclusively rebut an inference of scienter. Director Margolis, several other partners in WOW Shares Partnership, and shareholder Robinson Interests sold their shares pursu-

---

7. The plaintiffs argue that we should be particularly sceptical of Deloitte's conduct in this case because the auditor had become "entangled" with WOW by offering discounts on its fees. This contention is utterly without merit:

> ... It defies economic reality to suggest that a professional firm which extends a discount or does not bill its full fee for its "learning curve" in order to retain and accommodate a client has compromised its independence merely because it may colloquially refer to that circumstance as an "investment" in the client. Indeed, this argument reflects the [plaintiff]'s general approach to this case, *i.e.*, to seize and grasp any fact to support any argument, however irrational, to justify its claim of fraud....
>
> ... It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees. The Court therefore declines the [plaintiff]'s invitation to look with a jaundiced eye at each accounting decision made during a complex audit merely because of an accountant's economic motivation in maintaining an ongoing relationship with a client.

*Price Waterhouse*, 797 F.Supp. at 1242 & n. 60 (citation omitted).

**1428**

ant to a predetermined plan in accordance with SEC Rule 144. Robinson Interests, moreover, "sold its shares because it faced a pressing need to service a huge debt incurred from overinvesting in real estate." *WOW*, 814 F.Supp. at 872 n. 17. Other WOW Shares partners "who supposedly possessed inside information did not sell at all." *Id.* at 872. Director Howenstein "sold only 50,000 shares before WOW's bankruptcy, though he possessed over 970,000" shares at the time of the bankruptcy. *Id.* Shareholder Abercrombie started selling WOW shares (to raise cash for real estate improvements) *after* the announcement of large quarterly losses and, in total, still held onto eighty-six percent of her WOW stock (2,870,000 shares) at the time the corporation filed for bankruptcy.

"[This] pattern of stock trading ... is insufficient to raise an issue for the jury.... Uncontradicted deposition testimony ... provided credible and wholly innocent explanations for the stock sales, ranging from long-standing programs of periodic divestment, to the need to free cash to meet matured tax liabilities. These unrebutted explanations are sufficient to defeat any inference of bad faith." *Apple Computer*, 886 F.2d at 1117. *See, e.g., Freeman v. Decio*, 584 F.2d 186, 197 n. 44 (7th Cir.1978) ("inference [of scienter] can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence").

We therefore affirm the district court's conclusion that the Directors and the Shareholders are not liable for insider trading.[8]

### V.

In conclusion, for the reasons stated by the district court in its excellent opinion, we affirm the summary judgment in favor of the defendants on all issues except the section 11 claim against Deloitte. We reverse and remand that claim, however, because the court applied an incorrect test of section 11(e) loss causation. In light of this remand, we also reinstate the plaintiffs' supplemental state-law claims against Deloitte.[9] All defendants other than Deloitte are awarded their costs.

**AFFIRMED in part. REVERSED in part. REMANDED for proceedings consistent with this opinion.**

---

8. In light of this conclusion, we need not consider the defendants' argument that, in any event, the plaintiffs cannot bring insider trading claims because they did not trade "contemporaneously" with the insiders. We do note, however, that recent Ninth Circuit authority indicates that the defendants' "contemporaneous trading" argument has significant merit. *See Neubronner*, 6 F.3d at 670 ("insider trading claims under section 10(b) and Rule 10b–5 is confined to persons who traded contemporaneously with the insider ... [and] contemporaneous trading must be

pleaded with particularity") (affirming dismissal of insider trading complaint).

9. The plaintiffs also brought "controlling person" claims against various defendants. *See* 15 U.S.C. §§ 77o; 78t(a). We affirm the summary judgment on these claims because, as the district court noted, "[t]here being no primary violation, there can be no secondary violation." *WOW*, 814 F.Supp. at 872. Deloitte's potential section 11 liability does not change this conclusion because the plaintiffs did not allege that any defendant controlled the auditor.